# Exhibit 2

STURGE - 9/11/2019

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,            )
                    Plaintiff,       )
                                     )
vs.                                  )  CRIMINAL ACTION NO.
                                     )  17-10198-FDS
SCOTT J. WOLAS,                      )
                    Defendant.       )


        THE ORAL DEPOSITION OF CECILY STURGE,
held pursuant to Notice, and the applicable provisions of

the Federal Rules of Civil Procedure, before

Gail Kimbrough, a Court Reporter and Notary Public, within

and for the Commonwealth of Massachusetts, at the offices of

the United States Attorney, 1 Courthouse Way, Suite 9200,

Boston, Massachusetts, on Thursday, September 11, 2019, at

10:06 a.m.

Page 2

1    APPEARANCES:

2    On behalf of the United States:

3        CAROL E. HEAD, ESQ.
         SANDRA S. BOWER, ESQ.
4        Assistant U.S. Attorneys
         Office of the United States Attorney
5        1 Courthouse Way
         Boston, MA  02210
6        (617) 748-3100

7    For the Witness:

8        WILLIAM W. FICK, ESQ.
         Fick & Marx, LLP
9        24 Milk Street
         Boston, MA  02210
10       (857) 321-8360

11   Also Present:

12       Travis Mintier, Law Clerk, USAO
         Kelly Bell, Special Agent, FBI.
13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2    WITNESS                                                  PAGE

3    Cecily Sturge

4        Examination by Ms.Head                                 4

5    EXHIBIT    DESCRIPTION                                     PAGE

6    No. 1     Notice of Deposition                    9

7    No. 2     Collection of copies of newspaper articles  16

8    No. 3     U.S. Bankruptcy Courts, 9:97bk32154
               05/02/1997                               23
9
     No. 4     Letter, K. Weisiger, 3/31/2000           25
10
     No. 5     Dissolution of marriage                  27
11
     No. 6     Financial Affidavit 08/23/2001           30
12
     No. 7     Final Judgment, dissolution of marriage
13             05/13/2001                               34

14   No. 8     Order of Determination of Death          38

15   No. 9     E-mail, S. Velasquez                     42

16   No. 10    E-mail, J. Kerkhoff, 04/11/14            43

17   No. 11    Photos (2)                               56

18   No. 12    E-mail, K. Weisiger                      58

19   No. 13    E-mail, C. Sturge, 09/08/2016            61

20   No. 14    E-mail, C. Sturge, 09/08/2016            62

21   No. 15    E-mail, C. Sturge, 09/08/2016            63

22   No. 16    K. Weisiger, Thursday 12/29/2016         65

23   No. 17    E-mail, C. Sturge 01/5/2017              67

24   No. 18    E-mail, K. Weisiger, 01/10/2017          68

25

STURGE - 9/11/2019

Page 4

1                    I N D E X

2     EXHIBIT    DESCRIPTION                                PAGE

3     No. 19     E-mail C. Sturge, 01/16/2017          69

4     No. 20     E-mail C. Sturge, 01/16/2017          71

5     No. 21     Letter, Wolas Law Group PLLC 04/20/2017   75

6     No. 22     Email, C. Sturge 02/4/2017            77

7     No. 23     E-mail, 12/6/2016                     77

8     No. 24     E-mail, 02/4/2017                     79

9     No. 25     E-mail, 02/4/2017                     79

10    No. 26     Prison phone transcript              86

11    No. 27     Sentencing memo, filed 05/16/18      91

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STURGE - 9/11/2019

Page 5

```
 1                  P R O C E E D I N G S

 2                                          (10:06 a.m.)

 3                     CECILY STURGE, Sworn

 4              EXAMINATION BY MS. HEAD:

 5              MS. HEAD:  I'm Carol Head, Assistant United States

 6     Attorney for the United Sates.

 7              MR. MINTIER:  Travis Mintier, Law Clerk for the

 8     U.S. Attorney's Office.

 9              MS. BOWER:  Sandra Bower, Assistant U.S. Attorney.

10              MS. BELL:  Kelly Bell, Special Agent with the FBI.

11              MR. FICK:  Counsel for Ms. Sturge.

12              BY MS. HEAD:

13         Q    Ms. Sturge, would you please state your name for

14     the record?

15         A    Cecily Sturge.

16         Q    And where do you reside?

17              MR. FICK:  I'm sorry, Carol.  I don't mean to

18     interrupt.  I just want to be clear.  I guess we've doing

19     typical civil deposition arrangements in that all objections

20     except as to the form are reserved?

21              MS. HEAD:  That's correct.

22              MR. FICK:  Okay.

23              MS. HEAD:  Thanks.

24              BY MS. HEAD:

25         Q    So, where do you currently live?
```

STURGE - 9/11/2019

Page 6

1    A    Delray Beach, Florida.

2    Q    And what is your address?

3    A    166-G Delray Beach, Florida 33446.

4    Q    Have you ever been deposed before?

5    A    Yes, I have.

6    Q    And how many years ago was that?

7    A    Fifteen.

8    Q    Fifteen years ago?  Do you recall what that was in

9    connection with?

10   A    The same connection.

11   Q    A civil proceeding, lawsuit, or?

12   A    It had to do with Scott Wolas.

13   Q    Where did that deposition occur?

14   A    Boca Raton.

15   Q    And do you recall who took your deposition?

16   A    I do not.

17   Q    Was it the law firm of Hunton & Williams?

18   A    No.

19   Q    Was it a plaintiff suing Scott Wolas?  Do you

20   recall the name of the case?

21   A    I do not.

22   Q    Do you have any records from that case?

23        Do you know if the case that you were deposed in

24   was in federal or state court?

25   A    It wasn't in court.  It was in an attorney's

STURGE - 9/11/2019

Page 7

1  office.

2      Q    Yes, I'm sorry, but you were deposed in connection

3  with a case; is that correct?

4      A    Yeah.

5      Q    So, the litigation which is part of the

6  deposition, do you know where that litigation had been

7  filed, or anything about it?

8      A    I don't recall.

9      Q    Do you understand that you must give oral

10  responses today?

11      A    Yes.

12      Q    Okay.  Thanks.

13          And for the court reporter to take this down, we

14  can't talk over each other, so, if you would wait for me to

15  finish my questions before answering, and I will try to wait

16  for you to finish your answer before asking another

17  question.  That will allow the court reporter to take the

18  testimony down in a smoother fashion.  Do you understand

19  that?

20      A    Yes.

21      Q    Do you understand that if you don't understand a

22  question you can ask me to repeat myself for clarification?

23      A    Okay.

24      Q    And if you don't ask me for clarification I'm

25  going to assume that you understand the question; do you

Page 8

1  understand that?

2      A    Yes.

3      Q    If you want to take a break at any time please let

4  me know.  I just ask that you don't request a break while a

5  question is pending.

6      A    Okay.

7      Q    So, we can take a break after you've answered the

8  question.

9      A    Okay.

10     Q    Are you taking any medication today that would

11  prevent you from giving accurate testimony?

12     A    No.

13     Q    Do you have any condition that would prevent you

14  from testifying truthfully and accurately today?

15     A    No.

16     Q    Is there any reason at all why you can't testify

17  truthfully and accurately today?

18     A    No.

19     Q    Do you understand that we could have had this

20  deposition in Florida, that the government offered to pay to

21  fly you up to Boston for the deposition today?

22     A    I didn't know how all that works, no.

23     Q    Okay.  Do you want a moment to talk about that

24  with your lawyer?

25     A    I'm here.

Page 9

1           MR. FICK:  I don't know what --

2           MS. HEAD:  If she had wanted to have had the

3   deposition in Florida we would have had the deposition in

4   Florida.

5           BY MS. HEAD:

6      Q    I don't know if you understood that or if you want

7   to talk to your lawyer about that.

8      A    That's okay.

9      Q    Okay.

10          And you understand that you are here today

11  pursuant to a deposition subpoena?

12     A    Yes.

13          MR. FICK:  Objection.  It is not technically a

14  subpoena, but there was a notice that she was required

15  because of the proceeding, so, yes.

16          BY MS. HEAD:

17     Q    You are here today pursuant to a deposition

18  notice.

19                        (Deposition Exhibit No. 1 was

20                         marked.)

21          BY MS. HEAD:

22     Q    Have you seen this document before?

23     A    No.

24     Q    But you understand today that you're here under

25  oath and required to testify truthfully?

STURGE - 9/11/2019

Page 10

1        A     Yes.

2        Q     Do you understand that we're here today because

3    you filed a petition claiming an interest in a retirement

4    account held at the law firm of Hunton Andrews & Kurth,

5    formally Hunton & Williams?

6        A     Yes.

7        Q     I'd like to talk a little bit about some

8    background facts.  Were you married to Scott Wolas?

9        A     Yes.

10       Q     Was that your first marriage?

11       A     No.

12       Q     It was your second marriage?

13       A     Yes.

14       Q     Was it Scott Wolas' first marriage?

15       A     No.

16       Q     So, was it his second marriage?

17       A     Yes.

18       Q     Who were you married to before Scott Wolas?

19       A     His name was Carl Graziano.

20       Q     And when were you married?

21       A     I don't recall the year.

22       Q     Do you recall when you married Scott Wolas?

23       A     1982.

24       Q     And where did you live during that marriage?

25       A     In Westchester County New York.

STURGE - 9/11/2019

Page 11

1      Q    So, from 1982 until when?

2      A    1989 I left New York.

3      Q    Okay.  And where did you go after you left New

4  York?

5      A    Florida.

6      Q    And where in Florida?

7      A    Boca Raton.

8      Q    Did Scott Wolas work while you were married?

9      A    Yes.

10     Q    Where did he work?

11     A    He worked at Curtis Malloy.

12     Q    Okay.

13     A    And then after, I don't know how long, he moved on

14  to Hunton & Williams.

15     Q    Do you remember exactly about when he moved to

16  Hunton & Williams?

17     A    I want to say '95 but I'm not sure that's right.

18     Q    Did you work during your marriage?

19     A    Yes.

20     Q    Where did you work?

21     A    I'm a registered nurse.  I worked in Mr. Sinai New

22  York Hospital.  And then when I came down to Florida I

23  worked at Boca Regional Hospital.

24     Q    Do you have any children with Mr. Wolas?

25     A    Yes, one.

STURGE - 9/11/2019

Page 12

1        Q    And that is Tyler Wolas?

2        A    Yes.

3        Q    Now, you said you moved out, you moved to Florida

4    in 1989?

5        A    Mm-hmm.

6        Q    Did you attempt to get a divorce at that time?

7        A    I thought about it but there was no reason at that

8    time for it to be important.

9        Q    Did you, after you stopped living with Scott

10   Wolas, did he pay for your living expenses?

11       A    Yes.  He sent me money every month.

12       Q    Okay.  And did that stop at some point?

13       A    Oh, yeah.

14       Q    And approximately when did that stop?

15       A    When his job with Hunton & Williams ended.

16       Q    And do you recall when that was?

17       A    I don't.

18       Q    After you stopped living together did Scott Wolas

19   see your son?

20       A    Yes.

21       Q    And did that end at some point?

22       A    Intermittently.  It wasn't on a regular basis.

23       Q    Did you and Scott Wolas file joint tax returns

24   when you were married?

25       A    Yes.

Page 13

1   Q   And was that up until the time he disappeared?

2   A   I guess.

3   Q   Do you remember one way or the other?

4   A   I don't remember.

5   Q   Is there anything that would help you remember?

6   A   I think that he did handle all that, I just don't

7   recall when I stared doing it on my own.

8   Q   Do you remember if you were on his health plan

9   with Hunton & Williams?

10  A   I don't recall.

11  Q   You don't remember how you got health benefits

12  while you were married?

13  A   Well, I was with several companies.  I had several

14  different health benefits at different times.

15  Q   And you told me where you currently live.  How

16  long have you lived there?

17  A   Almost ten years.

18  Q   And where did you live before that?

19  A   I lived in Delray Beach, but in a different place.

20  Q   Did you ever live in Boca Raton?

21  A   Sure.

22  Q   When did you live in Boca Raton?

23  A   I moved to Boca Raton in 1989.

24  Q   And how long did you live there?

25  A   Maybe ten years, maybe more.

Page 14

1      Q      And what was the address you lived at in Boca

2  Raton?

3      A      There were several.  I can't recall them.

4      Q      Okay.  Any of them?

5      A      I know the streets, I can't give you the numbers.

6      Q      Can you give me the streets?

7      A      I rented a condo in Montego Bay.  I rented a house

8  on 15th Street.  And then I purchased a home in Boca Point.

9  I'm trying to think of the address.  I don't recall.

10     Q      That was Montego Bay Blvd; is that where you lived

11 in Boca?

12     A      I don't now if was a boulevard or not.

13     Q      Do you remember the years that you lived in

14 Montego Bay?

15     A      I don't.  I'm not sure.

16     Q      Do you remember how long you lived there?

17     A      Montego Bay?

18     Q      Mm-hmm.

19     A      I moved there after I lost my home in Boca Point.

20     Q      Okay.  And when was that, approximately, if, you

21 know?

22     A      I don't know.  I don't recall.  I don't want to

23 just give you 1998, 1997, because I'm really not sure.

24     Q      And at some point Scott Wolas disappeared; is that

25 correct?

STURGE - 9/11/2019

Page 15

1      A      That's correct.

2      Q      Do your recall when that was?

3      A      Either '95 or '97.

4      Q      Or '96?

5      A      I don't know.

6      Q      Mid-90s; is that fair to say?

7      A      Yes.

8      Q      And were you aware at that time that he was

9   indicted on criminal charges in New York?

10     A      No.

11     Q      I had a girlfriend in New York who used to call me

12  at my job and say, "Whatever you're doing, get up and leave

13  and go look at the paper."

14     A      Okay.  Do you remember when that was?

15     Q      I was at Kemper at the time.  I don't know the

16  dates.  I mostly learned about most of it through the paper.

17     A      And what time period did you work at Kemper?

18     Q      I don't know the dates.

19     A      So, you remember reading about your husband in the

20  paper?

21     Q      Most of what I've learned has been in the paper.

22     A      And was that in the 90s?

23     Q      Well, the late 90s when he first left New York and

24  they were looking for him, yes.

25     A      Do you remember what papers?

Page 16

1      Q    New York Times, Newsday.

2           MS. HEAD:  So, I'm putting in front of the witness

3    a collection of newspaper articles from the Wall Street

4    Journal and the New York Times, and Newsday.

5                          (Deposition Exhibit No. 2 was

6                          marked.)

7           BY MS. HEAD:

8      Q    And if you would just take a minute and look

9    through that?

10     A    Are they chronological?

11     Q    That, I'm not sure.  I think they're by

12   publication.  So, the first one is --

13     A    I don't see a date on here.

14     Q    It is very small.

15          So, the first one is from the Wall Street Journal

16   from June 16th, 1997.

17     A    Where do you see that?

18     Q    At the very top.

19          MR. FICK:  Teeny, teeny, tiny.

20          THE WITNESS:  Oh, I didn't see it.  Okay, '97.

21   Okay.

22          BY MS. HEAD:

23     Q    And why don't I just read into the records these

24   dates.  The second article is also from the Wall Street

25   Journal from December 23rd, 1998.  The third article is from

STURGE - 9/11/2019

Page 17

1    Newsday, June 5th, 1996.  The fourth article is also from

2    Newsday from January 26th, 1996.  The 5th article is from

3    the New York Times, January 18th, 1996.  And then the 7th

4    article is the National Law Journal from May 13th, 1996.

5    And the 8th article is from the National Law Journal from

6    August 26th, 1996.

7            You can take as much time looking at these as you

8    want, but basically I'm interested in if these are the types

9    of articles that you saw when you mentioned that you saw

10   newspaper articles about your husband.

11           MR. FICK:  Objection.  But you can answer if you

12   can.

13           THE WITNESS:  Well, I'm looking over this one

14   because I don't recall this one.  And I never saw this

15   article.

16           (Whereupon, the witness read through Exhibit 2

17   from 10:18 a.m. to 10:28 a.m.)

18           BY MS. HEAD:

19      Q    Ms. Sturge, while you can read as much as you want

20   for this, I just want to ask you if you remember seeing any

21   of these?

22      A    Some of these are brand new to me so it is

23   interesting.

24      Q    We can give you a copy to take, to read, if you

25   would like.

STURGE - 9/11/2019

Page 18

1        A    You don't want me read anymore?

2        Q    I'm not going to ask you specific questions.  You

3    can do what, you can read as much as you want, but I just

4    want to ask you if you could flip through them and see if

5    any of them you think you saw at the time.

6        A    So, far, no.  These are --

7        Q    So, maybe look at the headlines?

8             MR. FICK:  I you want you can just look at the

9    headlines and if they ring a bell you can tell her, if they

10   don't, they don't.

11            THE WITNESS:  You don't want me to read this?

12            MR. FICK:  In the interest of time maybe we can

13   read them later, but unless there is a question that

14   requires you to read them it is sort of up to you.

15            BY MS. HEAD:

16       Q    Yeah.  I'm not going to ask you a question about

17   the content at all.

18       A    Okay.

19       Q    I just want to know, you mentioned that you saw

20   articles in Newsday an the New York Times about your husband

21   and I was curious, understanding that it was a while ago, if

22   any of these look like the articles.

23       A    Okay.  This is all mine to keep?

24       Q    The Exhibits with the exhibit stamps on them are

25   part of the official record, but I can give you a copy if

Page 19

1    you would like.

2         A     Yeah, I would like a copy.

3              MR. FICK:  I'll have a copy that I can share with

4    you.

5              THE WITNESS:  Thank you.  You've seen this before?

6              MR. FICK:  Well, we can talk later, but I mean,

7    no.

8              BY MS. HEAD:

9         Q     As you testified earlier, you had seen some

10   articles in Newsday and the New York Times about your

11   husband in the 1990s.  Do you remember seeing these

12   articles?

13        A     Some of the information, yes.  The exact articles,

14   no.  Actually I saw articles that had pictures, cartoons

15   about him.  I don't see any Newsday articles here.

16        Q     There were two.

17        A     Whatever.

18        Q     But, yeah, I mean it is 20 years or more later,

19   so.

20              Okay.  Thank you.

21              So, you mentioned you talked to a girlfriend about

22   your then husband, Scott Wolas, when he disappeared.  Where

23   there other people that you talked to about the

24   disappearance?

25        A     No.  She happened to be a girlfriend of mine at

STURGE - 9/11/2019

Page 20

1    the law firm and we were very close.

2        Q    She was at the law firm of Hunton & Williams?

3        A    Curtis Malloy.

4        Q    Okay.

5        A    So, I talked to her about it but nobody knew about

6    it in Florida and I tried for a very long time, pretty

7    successfully, to keep that under -- you know, I had a kid in

8    school.  I had a kid in school and you know I heard that up

9    north there were people with guns sitting in the driveway at

10   the house in Westchester, so, I was frightened.

11       Q    Did anybody contact you after his disappearance?

12       A    I was always contacted, constantly.

13       Q    Do you remember who contacted you?

14       A    No.  Cops, the SEC, maybe the FBI.  I don't

15   recall.  When I finally divorced him, one of he reasons was

16   I thought that might stop.

17       Q    And --

18       A    I mean he never lived there and they had a mug

19   shot of him in every gate of the community.  And he had

20   never lived there.  So, I was trying to protect my child who

21   was, I don't know, in the fifth grade by then maybe.

22       Q    Were you interviewed by law enforcement?

23       A    I believe so.

24       Q    And do you have any idea when that was?

25       A    I really don't.  It is like when he first

STURGE - 9/11/2019

Page 21

1   disappeared, they were calling me, or contacting me.

2        Q    And do you recall if they asked you questions

3   about what happened at Hunton & Williams?

4        A    If they asked me any questions, it was obvious I

5   didn't know any answers.

6        Q    After your husband disappeared, did you reach out

7   to anybody at Hunton & Williams?

8        A    No.

9        Q    Did they contact you?

10       A    No.

11       Q    Did you try and find out information about Scott

12   Wolas after he disappeared?

13       A    From whom?

14       Q    Anyone?

15       A    The only information that I ever got was from my

16   girlfriend in New York and about the newspaper articles.

17       Q    And I assume that people who contacted you were

18   trying to find him?

19       A    Oh, yeah.

20       Q    And did that begin shortly after he disappeared?

21       A    I don't recall.

22       Q    Do you know if your son Tyler had any contact with

23   Wolas after he disappeared?

24       A    Yes, he did.

25       Q    Do you know when that was?

STURGE - 9/11/2019

Page 22

1    A    At different times, long spaces of time, I didn't

2    really know when.

3    Q    When he was a child?

4    A    Yes.

5    Q    And were you, you were aware of the contacts that

6    Wolas had with your son Tyler?

7    A    Yeah, it was very frustrating for Tyler because

8    Scott would say he was going to call him and of course he

9    wasn't going to call the house, so, Tyler would spend hours

10   waiting for his father to call at the squash court.  It was

11   a very frustrating time for the kid.

12   Q    And do you recall how old, approximately, Tyler

13   was at this time?

14   A    I want to say fifth grade when it all came down.

15   I'm not sure, but.

16   Q    And after that did Scott Wolas continue to try and

17   contact Tyler?

18        (No verbal response.)

19   Q    Did he continue to try and contact Tyler?

20   A    I think he did sometimes.  I don't know.

21   Q    Did you file for bankruptcy in 1997?

22   A    Did I?  I don't recall.  Did I?

23   Q    You don't recall if you did or not?

24   A    I don't recall.

25   Q    Do your recall filing for bankruptcy?

STURGE - 9/11/2019

Page 23

1       A    I recall considering it, I think, when I couldn't

2  sell the house.  But eventually I did sell the house and so

3  I'm not sure, I don't think I filed for bankruptcy.

4       Q    And which house are you referring to?

5       A    The one in Boca Raton that I owned.

6            MS. HEAD:  Mark this as Exhibit 3.  I have put in

7  front of the witness a document that is marked as Exhibit 2

8  which is a docket for the United States Bankruptcy Court.

9            THE WITNESS:  So, I did file?

10                          (Deposition Exhibit No. 3 was

11                          marked.)

12           BY MS. HEAD:

13      Q    That is what I wanted to ask you, if looking at

14  this refreshes your recollection in any way as to whether

15  you filed for bankruptcy?

16      A    Well, then it says it was dismissed.  I don't

17  really recall. I just remember that I considered it and then

18  it was -- oh, it was Mirabella Circle.  That was the house.

19           It was a bad time in the market. I couldn't get

20  rid of the house let alone make any profit on it at all.

21  Somebody knocked on the door one day and said, "Can I sell

22  your house?"

23           I said, "Forget it.  It is not for sale anymore.

24  Let the bank take it."

25           He said, "No, I think we have a buyer.  Somebody

Page 24

1   will definitely buy it.

2            I said, "Okay."

3            So, I signed a paper letting them have exclusivity

4   over selling the house and it was sold.  They tried to get

5   it cheaper and I said, "No.  You're not getting it cheaper.

6   I'm not making any money as it is."

7            So, they bought it for what I had bought it for.

8       Q    If you look at the second page of that document,

9   you'll see your name and then if you go across you'll see

10  the name of, John Segaul, I guess?

11      A    I have no idea who he is.

12      Q    Okay.

13      A    Should I know who he is?

14      Q    Just looking at the docket, he's listed as the

15  lead attorney for the debtor, which would be your, so, I was

16  wondering if you knew who he was.  But you don't?

17      A    But doesn't this say that it got dismissed?  I

18  don't really understand all this.

19      Q    Well, if you go to the next page, the docket

20  appears to reflect that a petition was filed for the debtor.

21      A    So, I did, or I didn't?  Do we know?

22      Q    That is what I wanted to ask you.

23      A    It looks as if I had considered it.  I can't tell

24  by this paperwork whether I did or I didn't in the end, or,

25  whether it was dismissed.  I really don't recall.

STURGE - 9/11/2019

Page 25

1      Q    Do you recall when you filed for divorce from

2    Scott Wolas?

3      A    2001.

4      Q    Before you filed for divorce, had you communicated

5    with anybody at Hunton & Williams?

6      A    No.

7      Q    Not in any capacity?

8      A    No.

9      Q    And had you received any correspondence from

10   Hunton & Williams?

11     A    No.

12          MS. HEAD:  Can I mark Exhibit 4?

13          THE WITNESS:  I don't recall this at all.

14                    (Deposition Exhibit No. 4 was

15                     marked.)

16          BY MS. HEAD:

17     Q    So, I've marked for the record Exhibit 4 which is

18   a letter dated March 31st, 2000, Bates stamped HW-013.  Do

19   you see it is addressed in your name?

20     A    I see that.

21     Q    And the address is Montego Bay Blvd, Boca Raton,

22   Florida?

23     A    I see that.

24     Q    And you lived at that address?

25     A    I did live at that address.

Page 26

```
 1      Q     And this is regarding the Hunton & Williams

 2   retirement savings plan.  Do you see that is the RE: line?

 3      A     I see what it says, yes.

 4      Q     And I you read the first sentence after "Dear Ms.

 5   Sturge," it says, "As we have discussed --"

 6      A     I see that.

 7      Q     " -- you are the beneficiary of your husband's

 8   account under the Hunton & Williams retirement savings

 9   plan."

10      A     I see that, but I don't recall speaking to her

11   that early, or, at that time.

12      Q     So, you don't recall either receiving this

13   letter --

14      A     No.

15      Q     The letter suggests that there were --

16      A     I didn't get letters from her.  Mostly I think we

17   used e-mail, but I'm not sure.  I don't remember contacting

18   her at this early time.

19      Q     Do you remember having a phone call with Hunton &

20   Williams in this time period?

21      A     This time period?

22      Q     Yes.

23      A     No.  I think if I had known about it, I must have

24   pursued it and I wouldn't have lost the house.

25      Q     You see in this letter it states, "Under Virginia
```

STURGE - 9/11/2019

Page 27

1   law a missing person is presumed dead after seven years.  At

2   the appropriate time you will need to go to court to have

3   Mr. Wolas declared dead."

4           Do you see where it says that?

5   A   Okay.

6   Q   Did you ever go to court and have Mr. Wolas

7   declared dead?

8   A   I went to Social Security and said that he was

9   dead.  Dead or alive I wanted part of his Social Security.

10  I knew he wasn't collecting it.

11  Q   But did you ever initiate a court action to have

12  Mr. Wolas declared dead?

13  A   I did not.

14  Q   Do you know if anybody did?

15  A   I do not.

16  Q   Do you know if he was ever declared dead?

17  A   I don't know.

18  Q   So, turning to the divorce in 2001.

19          MS. HEAD:  I'd like to mark this as Exhibit 5.

20                      (Deposition Exhibit No. 5 was

21                      marked.)

22          BY MS. HEAD:

23  Q   And I've marked as Exhibit 5 a copy of the

24  verified petition for dissolution of marriage and other

25  relief in the case of Cecily Sturge V Scott Wolas.

Page 28

1             Do you recognize this document?

2        A    I don't recognize it, but I see that it has my

3   name on it.

4        Q    Can you turn to the last page there, and do you

5   see a signature of Cecily Sturge?

6        A    I do.

7        Q    Is that your signature?

8        A    I believe it is.

9        Q    And if you go down you'll see there is a notary

10  that has signed it and dated it August 23rd, 2001?

11       A    I see.

12       Q    And then if you keep going down there is a

13  signature of an attorney, David Goldman; do you see that?

14       A    I see it.

15       Q    So, did David Goldman represent you in the divorce

16  proceedings?

17       A    He had an ad in the paper for getting a divorce

18  inexpensively and so I pursued him.  If I met him, I don't

19  even remember.  He just finally put it in court.  I didn't

20  (sic) even recall his name.

21       Q    So, do you recall signing this document in front

22  of a notary, before a notary?

23       A    No.  But it looks like my writing.  I'm sure it

24  is.

25       Q    Do you remember if you reviewed this document

STURGE - 9/11/2019

Page 29

1    before you signed it?

2        A    I do not remember.

3        Q    If you turn to paragraph 8 which is on the second

4    page, the second sentence of paragraph 8 says, "The husband

5    earns, or has earned, income far in excess of the wife and

6    is well able to contribute to the wife's support both during

7    and after these proceedings."

8            Do you see that?

9        A    I see it.

10       Q    Was that referring to income Scott Wolas earned as

11   a lawyer?

12           MR. FICK:  Objection.  You can answer.

13           THE WITNESS:  I don't know.  This does not look

14   familiar and it is talking about him sending me money and he

15   had disappeared and so it is confusing to me.

16           BY MS. HEAD:

17       Q    And if you look at paragraph 9 it says, "The

18   parties have accumulated numerous assets and debts during

19   the course of their marriage all of which need to be

20   equitably distributed between the parties at the time of

21   dissolution."

22           Do you see that?

23       A    I see that but it is just lawyer talk because I

24   told him we had nothing.  I didn't think we had anything.  I

25   was losing the house, or had lost it by then.  He wasn't

1    anywhere to be found so to say we've accumulated assets and

2    debts is crazy.

3         Q    And if you look at paragraph ten, it says, "That

4    due to the husband's abandonment and numerous acts of fraud

5    the wife is responsible for a large sum of debt for which

6    the husband should be responsible for and which the wife

7    should be held harmless from."

8              Do you see that?

9         A    I see it.

10        Q    Did you want to obtain this divorce to free

11   yourself from debts of Scott Wolas?

12        A    No.  I was tired of the calls.  I thought it would

13   stop people from calling me because, well, I was at work

14   once and some cops called me and they were in my apartment.

15   And my son was there.  You know, some crazy stuff had

16   happened.  So, I thought if I finally divorced him they

17   wouldn't be looking for his wife, so, that's why I did it.

18        Q    Okay.

19                        (Deposition Exhibit No. 6 was

20                         marked.)

21             BY MS. HEAD:

22        Q    I've marked as Exhibit 6 a financial affidavit

23   submitted in the court case, in RE: The marriage of Cecily

24   Sturge and Scott Wolas.

25        A    Okay.

STURGE - 9/11/2019

Page 31

1      Q    If you turn to the last page you'll see a

2  signature.  Is that your signature?

3      A    I believe so.

4      Q    And above it is a statement, "I'm aware that any

5  materially false statement knowingly made with the intent to

6  defraud or mislead shall be subject made to the penalty for

7  perjury and may be considered a fraud upon the court."

8           Do you see that?

9      A    I see that.

10     Q    And this is dated August 23rd, 2001 which is the

11  same day as the petition; do you see that?

12          Do you see that it is dated --?

13     A    I see that.

14     Q    So, did you complete this financial affidavit?

15     A    I believe so.

16     Q    Do you recall if you consulted with your lawyer

17  when you completed it?

18     A    I don't recall.  I had very little contact with

19  him.

20     Q    Okay.

21     A    I just wanted to get this done cheap and easy.

22     Q    Did you try to be accurate with the numbers that

23  you listed?

24     A    As well as I could be, yes.

25     Q    Did you gather financial records to help you

Page 32

1    complete this?

2        A    No.  I did this at whatever my current expenses

3    were where I was living at the time.

4        Q    Okay.  But did you refer to any financial records,

5    bank statements, when you prepared this?

6        A    I don't see any.

7        Q    If you turn to page 5 there is a list of assets

8    and you have assets listed under the wife's name, but you

9    have none under the husband's name.  Do you see that?

10       A    I see assets, yes.

11       Q    Did you do any -- and you see there is nothing

12   listed under the husband's name?

13       A    I don't see the husband's name.

14       Q    At the top of the page it says assets?

15       A    Yes.

16       Q    And it says --

17       A    Oh, I see husband's name, okay, right.

18       Q    And you see that there is nothing listed there?

19       A    Correct.

20       Q    Did you do anything to try to locate any of Scott

21   Wolas' assets when you were filling out this form?

22       A    I don't think he had any.  I'm sure he left Hunton

23   & Williams with whatever, well, I guess we had the house up

24   in Westchester, that was still in my name.  But I think that

25   went into foreclosure.

Page 33

1     Q   But did you do anything to try and locate any

2  assets of Scott Wolas while you were filing this divorce?

3     A   No.

4     Q   Do you know if your attorney did?

5     A   No, I told him that he wasn't around.

6     Q   You told your attorney that Scott Wolas wasn't

7  around?

8     A   That's right.

9     Q   And did you contact any of Scott Wolas' former

10  employers in preparing this affidavit?

11     A   No.

12     Q   Or at any time during the divorce proceedings?

13     A   No, I did not.

14     Q   Would you agree that it was a mistake not to

15  include Hunton & Williams retirement account on this asset

16  form?

17          MR. FICK:  Objection.  You can answer.

18          THE WITNESS:  I didn't know about it, or, I would

19  have.

20          BY MS. HEAD:

21     Q   Would it have been a mistake not to have done

22  that?

23          MR. FICK:  Objection.  She can answer.

24          THE WITNESS:  Would it have been a mistake not to

25  what?

STURGE - 9/11/2019

Page 34

1              BY MS. HEAD:

2        Q    Have listed the retirement account here?

3        A    I didn't know about it.

4        Q    Did you ever provide any updated financial

5    affidavit to the court?

6        A    Besides this?

7        Q    Yes.

8        A    Not to my knowledge.

9        Q    So, if I understand, you wanted a quick divorce

10   and you didn't do anything to try and locate assets for

11   Scott Wolas in connection with the divorce?

12       A    He had --

13             MR. FICK:  Objection.  You can answer.

14             THE WITNESS:  He had fled.

15             BY MS. HEAD:

16       Q    So, you didn't do anything to try and locate his

17   assets?

18             You've got to answer orally.

19       A    No.

20             MS. HEAD:  I've marked as Exhibit 7 the final

21   judgment of dissolution of marriage, RE: The marriage of

22   Cecily Sturge and Scott Wolas.

23                              (Deposition Exhibit No. 7 was

24                               marked.)

25             BY MS. HEAD:

Page 35

1       Q    You obtained a final judgment of dissolution of

2  marriage from Scott Wolas in November of 2001; is that

3  correct?

4       A    If that is what it

5   says, yes.

6       Q    Did the court hold a hearing before it entered

7  this?

8       A    I don't think I ever went to court.  It was

9  something that my attorney handled.

10      Q    If you turn to the last page, there is form,

11  "Final Disposition Form," it has checked, "Dismissed after

12  hearing."

13      A    Oh, so there was a hearing.

14      Q    Well, I'm asking you if you recall going to a

15  hearing.

16      A    This is a long time ago.  I don't recall, but, if

17  it says I was there, then I was there.

18      Q    So, you don't recall attending the hearing as you

19  sit here today?

20      A    I don't recall.

21      Q    If you refer to paragraph 8.  By the way, have you

22  seen this?  Have you seen this dissolution order when it

23  came out?

24      A    Probably.

25      Q    Do you remember reviewing it in 2008?

STURGE - 9/11/2019

Page 36

1    A    I don't remember.  In 2008?

2    Q    I'm sorry, 2001.

3    A    I don't recall.

4    Q    So, paragraph 8 says, "The parties do not own any

5    marital assets which require equitable distribution."  Do

6    you see that?

7    A    I see.

8    Q    You didn't ever object to that finding; did you?

9         MR. FICK:  Objection.  She can answer.

10        THE WITNESS:  No, I didn't object to it.

11        BY MS. HEAD:

12    Q    If you go down to small letter, c, further down

13    the page.  "The respondent has been, shall, be responsible

14    for all debt incurred in his name during the course of the

15    marriage and shall be responsible for all joint debt

16    incurred during the marriage."  Do you see that?

17    A    I see it.

18    Q    Was that provision significant to you?

19    A    This is lawyer talk.  I didn't even know what it

20    means.

21    Q    At any time prior to 2017 did you seek to amend

22    this divorce order?

23    A    Prior to 2017?

24    Q    Yes.

25    A    No.

Page 37

1     Q     Between the time Scott Wolas fled New York in the

2  '96 time period and December 2016, did you have any contact

3  with him?

4     A     Occasionally.

5     Q     Do you remember was it by phone, in person?

6     A     Always by phone.

7     Q     Do you remember when that contact was?

8     A     No.  It was nothing with any regularity.

9  Occasionally.

10    Q     Do you recall how often?

11    A     I don't, no.  Not often at all.

12    Q     Once a year?

13    A     Maybe more than that.

14    Q     So, you think you had contact more than once a

15  year and that continued over the course of that time period?

16    A     There were years I don't think I heard from him.

17    Q     Do you remember when those might have been?

18    A     I don't recall.  He didn't call very often.

19  Mostly I was just concerned with his contact with his child.

20    Q     To your knowledge had your son Tyler, so, you know

21  that your son had contact with Scott Wolas between the time

22  Scott Wolas fled New York and --

23    A     Sometimes he did, and sometime he did not.

24    Q     Was that by phone or in person?

25    A     By phone.

STURGE - 9/11/2019

Page 38

1      Q    Do you recall when that was?

2      A    No.  As I stated there were, you know, there was

3  nothing that was on any regular schedule.

4      Q    We touched on this before, but were you aware at

5  one point Scott Wolas was declared dead?

6      A    I saw something that said that.  I don't know

7  where it came from.  I don't know if it came from a court.

8  I don't know anything about it.  I used it to get some of

9  his Social Security.

10          MS. HEAD:  So, I've put in front of the witness

11  Exhibit 8.

12                     (Deposition Exhibit No. 8 was

13                     marked.)

14          BY MS. HEAD:

15     Q    This is a document filed in the Circuit Court for

16  Manatee County Florida and RE: Estate of Scott Jonathan

17  McKay Wolas, A.K.A. Allen Lee Hengst, A.K.A. Robert Francis

18  McDowell.

19          Have you seen this document before?

20     A    I don't think so.  I don't know.

21     Q    It is an order of determination of death; do you

22  see that?

23     A    Was this because so much time had lapsed?

24     Q    So, I'm asking you the questions.

25     A    What's your question?

Page 39

1       Q    My question is, you don't remember seeing this?

2       A    I had some piece of paper, I don't think it was

3  this one, but I did have some piece of paper that I took to

4  Social Security so I could get some of his Social Security.

5       Q    Do you remember how you obtained that piece of

6  paper?

7       A    No.

8       Q    Do you see in this document the cause came to be

9  herd on the petition of Robert M. Elliot --

10      A    Who is that?

11      Q    -- do you see that on the first line?

12      A    I don't know who that is.

13      Q    Did you know if Scott Wolas resided in Manatee

14  County Florida?

15      A    Not to my knowledge.

16      Q    Do you see in the second paragraph toward the end

17  it says, and decedent was last known to be domiciled in

18  Manatee County Florida?

19      A    Really?  I don't know if he ever lived in Manatee

20  County.

21      Q    You said you sent Social Security some paperwork?

22      A    I went in there.  I made an appointment and I went

23  in there.

24      Q    And what did you --?

25      A    I was able to receive about $400.00 a month from

STURGE - 9/11/2019

Page 40

1    his Social Security.

2        Q    And what did you present Social Security as

3    documents?

4        A    A document saying that he was declared dead, but,

5    that doesn't look familiar to me.

6        Q    Do you remember where you got that document?

7        A    No.

8        Q    Do you remember when you went to Social Security?

9        A    I don't.

10       Q    Did you ever notify Social Security that Wolas

11   was, in fact, alive?

12       A    No.  Because I felt that I was entitled to the

13   money whether he was dead or alive.

14       Q    Did you ever pay Social Security back the money

15   that you received?

16       A    They took it all back.  I haven't had Social

17   Security for seven months.

18       Q    The money that you --

19       A    That they said I shouldn't have had.

20       Q    So, they made you pay money, or, they're not

21   giving you Social Security now?

22       A    I did not get a Social Security check for seven

23   months.

24            MS. HEAD:  I'm fine if you want to take a break

25   now, or, not?

STURGE - 9/11/2019

Page 41

```
 1              MR. FICK:  Do you want to take a break?

 2              THE WITNESS:  Sure.

 3              (Whereupon, a break was taken from 11:10 a.m.

 4  until 11:16 a.m.

 5              BY MS. HEAD:

 6      Q    Who is Stephanie Velasquez?

 7      A    My daughter-in-law.

 8      Q    And she is also an attorney?

 9      A    Yes.

10      Q    Did Ms. Velasquez contact Hunton & Williams in

11  2014 on your behalf?

12      A    I believe she did.

13      Q    And it was in regards to Scott Wolas' retirement

14  account?

15      A    Yes.

16      Q    Why did she do that?

17              MR. FICK:  Objection.  You can answer.

18              THE WITNESS:  I had received something in the mail

19  making me aware of the retirement account.  And I didn't

20  know what to do with it, and, so, I asked them.  That's why

21  she made the call.

22              BY MS. HEAD:

23      Q    "Them" being?

24      A    Stephanie.

25              MS. HEAD:  I'd like to mark this as Exhibit 9.
```

STURGE - 9/11/2019

Page 42

1          MR. FICK:  Was there an Exhibit 8?  Oh, I'm sorry,

2   I see it.  My mistake.

3          MS. HEAD:  That's okay.

4          MS. HEAD:  So, I've put in front of the witness a

5   document marked Exhibit 9 which is a February 19th, 2014 e-

6   mail from Stephanie Velasquez bearing the Bates stamp HAK-

7   0006.

8                    (Deposition Exhibit No. 9 was

9                     marked.)

10         BY MS. HEAD:

11    Q    And you see this e-mail at the top of the thread

12  is an e-mail from Stephanie.  "Attached please find the

13  order of determination of death dated October 5th, 2011

14  concerning Scott Wolas."  Do you see that?

15    A    I see.

16    Q    And attached to the e-mail at HAK-0008 is a copy

17  of the order of determination of death filed in the Circuit

18  Court for Manatee County Florida.

19    A    I see.

20    Q    Were you aware that Stephanie was sending the

21  court order to Hunton & Williams?

22    A    I was aware that she was in contact with them.  I

23  had asked her to help me out.

24    Q    Do you know how she got the court order?

25    A    I have no idea.

STURGE - 9/11/2019

Page 43

1       Q    Do you know, so, you don't know that she was

2   specifically sending this e-mail?

3       A    I never saw a copy of it.  She should have sent me

4   a copy of anything from when she corresponded with them,

5   but, she didn't.

6       Q    Do you know why she was sending the court order of

7   determination of death to Hunton & Williams?

8            MR. FICK:  Objection.  You can answer.

9            THE WITNESS:  No.

10           BY MS. HEAD:

11      Q    Was it in an effort to get the retirement account?

12      A    I think I had just learned by mail, or something,

13  about the retirement account.  And I asked her some

14  questions and she offered to help me.

15      Q    She being Stephanie Velazquez?

16      A    Yes.

17           MS. HEAD:  I've put in front of the witness a

18  document marked Exhibit 10 which is an e-mail to Stephanie

19  Velazquez dated April 11th, 2014 bearing the Bates No. HAK-

20  0009.

21           THE WITNESS:  This says that I contacted the plan

22  in 1997.  That really doesn't make much sense.

23                         (Deposition Exhibit No. 10 was

24                          marked.)

25           BY MS. HEAD:

```
                                                            Page 44
 1      Q    So, I wanted to ask you if you'd seen this e-mail

 2  before?

 3      A    No, I have not.

 4      Q    And if you turn to the second page, the first full

 5  paragraph starting, "In short, the planned fiduciaries need

 6  to insure that the plan is paying to the correct beneficiary

 7  under both applicable law and the terms of the plan."  Do

 8  you see that, where I am?

 9      A    I see where you are.

10      Q    And then there are a number of questions.  And

11  then it says, "Again, based on the circumstances surrounding

12  Mr. Wolas' departure from Hunton & Williams and the

13  uncertainties concerning his death and marital status, the

14  plans' fiduciaries request that Ms. Sturge provide a sworn

15  affidavit attesting to her answers to the above questions

16  and that she has no knowledge of Mr. Wolas' whereabouts

17  during the period from October 5th, 2006 to the date of the

18  affidavit."  Do you see that?

19      A    I see that.

20      Q    Did you ever provide a sworn affidavit to Hunton &

21  Williams?

22      A    No.

23      Q    Did you have knowledge of Mr. Wolas' whereabouts

24  during the period from October 5th, 2006 to the date of the

25  affidavit?
```

STURGE - 9/11/2019

Page 45

1           MR. FICK:  Objection.

2           THE WITNESS:  What is the question?

3     Q    Did you ever have any knowledge of Mr. Wolas'

4  whereabouts from the period of October 5th, 2006 to the date

5  of this e-mail which is April 11th, 2014?

6     A    No.

7     Q    You hadn't been in contact with him?

8           MR. FICK:  Objection.

9           THE WITNESS:  I don't think so.

10          BY MS. HEAD:

11    Q    Do you know if your son had been?

12    A    Perhaps.

13    Q    Going to the next paragraph, "In addition the

14  fiduciaries plan to contact the secondary beneficiaries,

15  Ryan and Taylor Wolas, asking them as next of kin and

16  contingent beneficiaries to also confirm their knowledge of

17  the above information by sworn affidavit."

18          Do you see that?

19    A    I see that.

20    Q    Did you ever discuss with either Tyler or Ryan

21  Wolas obtaining an affidavit that they did not know the

22  whereabouts of Mr. Wolas?

23    A    I did not obtain any affidavit from either one of

24  them.

25    Q    Do you know if Tyler Wolas had been in contact

STURGE - 9/11/2019

Page 46

1   with Mr. Wolas between October 5th, 2006 and April 11th,

2   2014?

3        A    I don't know.

4        Q    You said before he had periodic contact with his

5   father?

6        A    Yeah.  You know he had lived in different places,

7   both of them had, so, the frequency of their contact, the

8   numbers, I don't know how much contact they had.

9        Q    Do you know that he didn't have contact?

10       A    Did I know that Tyler did not?

11       Q    To your knowledge --

12       A    There were times there was no contact.  There were

13  long periods of times where there was no contact.

14       Q    Do you know if Hunton & Williams ever contacted

15  Ryan or Tyler Walos?

16       A    I do not know.

17       Q    Did you or Ms. Velasquez ever respond to this

18  email?

19       A    I never saw this e-mail.  Did she respond to it?

20  Do you have response from her?

21       Q    I'm asking you if you know if she did.

22       A    I don't know.

23       Q    Scott Wolas contacted you in 2016; is that

24  correct?

25       A    That's correct.

Page 47

1    Q    Do you recall when he first contacted you in 2016?

2    A    I believe it was in the fall of 2016.

3    Q    In September of 2016?

4    A    Perhaps.

5    Q    What did you talk about?

6    A    We talked about whether he should turn himself in

7    or not.

8    Q    Anything else?

9    A    I don't know.  I don't know what we talked about.

10   Q    You don't remember?

11   A    It was a telephone conversation.  I don't

12   remember.

13   Q    Did you continue to speak with Mr. Wolas after

14   that call?

15   A    Yes.

16   Q    Why did you continue to speak with him?

17   A    Because he was contacting me.

18   Q    Was it all on the phone or was it --

19   A    All on the phone.

20   Q    And you didn't hang up on him?

21   A    No.

22   Q    You didn't block his calls?

23   A    No.

24   Q    You knew he was a fugitive when he was calling

25   you; correct?

STURGE - 9/11/2019

Page 48

1        A     Yeah, I'd seen it in the paper.

2        Q     And you didn't report him to the police at that

3     time?

4        A     No.  Well, I didn't know where he was and I

5     wouldn't have reported him to the police.

6        Q     Why not?

7        A     Because we have a son together and I wouldn't have

8     been the one to put him behind bars.  He can get there very

9     well by himself.

10       Q     In 2017 you filed a notice of petition to modify a

11    final judgment of dissolution of marriage; right?

12       A     (No audible reply.)

13             MS. HEAD:  So, this Exhibit has been marked in an

14    earlier deposition.  This is Exhibit 4 from the Wolas

15    deposition.

16             BY MS. HEAD:

17       Q     So, I think Ms. Sturge you nodded in response to

18    one of my questions about in 2017 you filed a notice of

19    petition to modify a final judgment of dissolution of

20    marriage; is that correct?

21       A     Yes.

22       Q     So, I've put in front of you an Exhibit that was

23    introduced at the deposition of Scott Wolas marked Exhibit

24    4.  It is a copy of a February 8th, 2017 filing in Florida

25    Court RE: The marriage of Cecily Sturge and Scott Wolas.

Page 49

1              Do you recognize this document?

2        A    Ah, not really.

3        Q    If you turn to the second page here, is that your

4    signature?

5        A    I believe it is.

6        Q    Did you prepare these documents?

7        A    I?  No.

8        Q    Do you know who did?

9        A    Scott did.

10       Q    And just going through the first two pages, the

11   notice of petition to modify the final judgment, do you see

12   that on the first page?  And, Scott prepared this document?

13       A    Yes, I believe he did.

14       Q    And then the third page has the petition to modify

15   the final judgment of dissolution of marriage.

16       A    What is the question?

17       Q    Is that what the document is entitled; do you see

18   that?

19       A    Yes.

20       Q    Did Scott Wolas prepare this document?

21       A    I believe so.

22       Q    And if you turn to, there is actually a Bates No.

23   at the bottom of the page which ends in 4754, if you can

24   turn to that page?  And the document is entitled affidavit

25   in support motion to modify final judgment of dissolution of

STURGE - 9/11/2019

Page 50

1    marriage to incorporate a qualified domestic relations order

2    as a term of the final judgment of dissolution.  Do you see

3    that title?

4         A    Yes, I do.

5         Q    And did Scott Wolas prepare this document?

6         A    I'm sure he did.

7         Q    And finally if you go to the Bates No. ending in

8    4764, at the top it says, "Preliminary proposed QDRO," Q-D-

9    R-O.  Did Scott Wolas prepare this document?

10        A    Yes.

11        Q    Do you know when Wolas drafted these documents?

12        A    In the winter months of 2017.

13        Q    Did you write any part of these documents?

14        A    No.

15        Q    Did you review them when he drafted them?

16        A    Not really.

17        Q    Did you make any changes to any of them?

18        A    No.

19        Q    And you didn't make any corrections to any of

20   them; right?

21             Did you have any involvement at all in the

22   preparation of these documents?

23        A    I knew he was doing them but, no, I knew nothing

24   about how to do it.  I didn't involve myself in it at all.

25        Q    Did you file them in court yourself?

STURGE - 9/11/2019

Page 51

1      A     I believe I did.

2      Q     Was Scott Wolas with you when you did that?

3      A     He may have been.  I don't recall.

4      Q     So, if you turn to page 3 of the petition which

5  is, I'll give you the Bates No., it ends in 4753.

6      A     Got it.

7      Q     And, actually, turn to the page before that.  At

8  the bottom it says, "I understand that I'm swearing or

9  affirming under oath to the truthfulness of the claims made

10  in this petition and that the punishment for knowingly

11  making a false statement includes fines and/or imprisonment;

12  do you see that?

13      A     I do.

14      Q     Do you understand that by signing these documents

15  you were swearing to this statement?

16      A     Yes.

17      Q     And on the next page, is that your signature?

18      A     I believe so.

19      Q     So, I'm going to put in front of you another

20  document from the Wolas deposition, Exhibit 6.

21           MS. HEAD:  I put in front of the witness a

22  document previously marked as Exhibit 6 from the deposition

23  of Scott Wolas entitled, "Supplemental affidavit to add an

24  exhibit inadvertently omitted from the prior affidavit of

25  Cecily Sturge." Then it goes on.

STURGE - 9/11/2019

Page 52

1          BY MS. HEAD:

2     Q    Have you seen this document before?

3     A    I don't recall.

4     Q    Do you know if Scott Wolas drafted this document?

5     A    Probably.

6     Q    If you turn to the page ending in 4783, is that

7  your signature?

8     A    Yes.

9     Q    Did you draft any portion of this document?

10         (No audible reply.)

11         Did you review this document?

12    A    Probably not.  I just signed where I was told to

13  sign.

14    Q    So, you didn't make any changes to it or any

15  corrections to it?

16    A    No.  I don't know anything about it.

17    Q    You didn't have any involvement in the preparation

18  of the document?

19    A    No.

20    Q    If you turn to 4781, at the bottom of the page,

21  paragraph 13, starting with "My former," do you see that at

22  the end of the line?  "My former spouse has concealed

23  himself so process cannot be personally served upon him.

24  This concealment has continued from 2001 through and

25  including the present."  Do you see that?

STURGE - 9/11/2019

Page 53

1    A    Where is this?  Which --

2    Q    Paragraph thirteen.

3    A    Thirteen?  Okay.

4    Q    Do you see that at the bottom of the page?

5    A    Right.  I see it.

6    Q    It starts as, "Just like the circumstances

7  surrounding my action for dissolution of my marriage, my

8  former spouse has concealed himself so process cannot be

9  personally served upon him.  This concealment has continued

10  from 2002 through and including the present."

11        Do you see that?

12    A    I see it.

13    Q    So, that statement wasn't true; was it?

14    A    It was not true.

15    Q    And then if you go to the next page, the last

16  sentence of paragraph thirteen, "His whereabouts are

17  unknown."

18    A    Well, that wasn't true at the time.

19    Q    And if you turn to paragraph 7, you state "At the

20  time the court ordered entry of judgment I was unaware of

21  the participation of my former spouse in the Hunton &

22  Williams retirement savings plan."  Do you see that?

23    A    I see that.

24    Q    Now, Scott Wolas wrote that; correct?

25    A    I believe so.

Page 54

1      Q    You didn't write that?

2      A    I wrote none of it.

3      Q    Okay.  And you knew he worked at Hunton &

4   Williams?

5      A    Oh, yeah.

6      Q    Did you know he participated in a retirement plan?

7      A    I didn't know until I got some letter telling me

8   about it.

9      Q    You had no knowledge that while Scott Wolas was a

10  partner in Hunton & Williams he was contributing to a

11  retirement plan?

12     A    I thought when he left Hunton & Williams, he left

13  with anything that was there of his.

14     Q    But you didn't do anything to investigate whether

15  that was true?

16          MR. FICK:  Objection.  Timeframe.

17          BY MS. HEAD:

18     Q    You didn't do anything after Scott Wolas left

19  Hunton & Williams to determine whether he had any assets

20  there?

21          MR. FICK:  The same objection.

22          THE WITNESS:  Can I answer?

23          MR. FICK:  Go-ahead.

24          THE WITNESS:  I didn't.  I certainly didn't right

25  after he left and I did when I finally -- I received

Page 55

1   something in the mail telling me about it, alerting me to

2   it, and then I had Stephanie checking it out.

3              BY MS. HEAD:

4        Q    Now, the affidavit and the petition also contain

5   inaccurate statements; is that not correct?

6              MR. FICK:  Objection.  You can answer.

7              THE WITNESS:  What inaccurate statement?  That I

8   didn't know where he was?

9              BY MS. HEAD:

10       Q    Yes.

11       A    Yes.  I agree.

12       Q    Did you sign these documents voluntarily?

13       A    Yes.

14       Q    And when you signed them, you knew where Scott

15   Wolas was?

16       A    Yes.  Because he prepared them.

17       Q    And he actually gave you the documents to sign; is

18   that correct?

19       A    Yes.

20       Q    And contrary to what you say in these documents,

21   you were in regular contact with Wolas in February of 2017?

22       A    Not regular.  I don't know what you call regular.

23       Q    Well, we believe in February of 2017 you had

24   exchanged at least 25 texts or phone calls with Wolas.

25       A    Twenty-five?  I doubt it.

Page 56

1      Q     Do you think it was less than that?

2      A     I'm not even sure he can text.  I don't know.

3      Q     Did you exchange any texts with him?

4      A     I don't know.  I don't know if he knew how to text

5   or not.  I don't recall.

6      Q     Was all of your contact by phone?

7      A     Yeah, I believe so.

8      Q     What about e-mail?

9      A     No e-mail.

10     Q     You never emailed Scott Wolas?

11     A     Never.

12     Q     4753, page 4753.

13           MR. FICK:  So, that is Exhibit 4 from Wolas?

14           MS. HEAD:  Yes, sorry.

15           BY MS. HEAD:

16     Q     You had your signature notarized; is that correct?

17     A     Yes.

18     Q     Do you remember where the notary was?

19     A     My bank, Citibank.

20     Q     When you went to have the signature notarized, was

21   Scott Wolas with you?

22           MS. HEAD:  I'm going to mark this as 11.

23           I've put in front of the witness a document marked

24   Exhibit 11 which is a surveillance photo from the bank.

25                          (Deposition Exhibit No. 11 was

1              marked.)

2         BY MS. HEAD:

3    Q    Have you seen this photograph before?

4    A    I saw a different one.

5    Q    There are two.

6    A    I never saw that one before.  I saw a different

7    one.  It didn't have the full body in it.  It was sort of

8    like, I think, head shots.

9    Q    Do you recognize the location of this?

10   A    Oh, yeah.  That's us.

11   Q    Where is it?

12   A    Citibank in Delray Beach.

13   Q    How did it come to be that Scott Wolas drafted

14   these documents for you to sign?

15        MR. FICK:  Objection.

16        THE WITNESS:  Should I answer it?

17        MR. FICK:  If you can, go ahead.  Sure.

18        THE WITNESS:  I had admitted to him when I saw him

19   that I was trying to obtain this money from Hunton &

20   Williams.  He didn't seem to know about it.  And he said

21   that my attorney must have been an idiot not to check out

22   the fact that he had a retirement plan.  That's beside the

23   fact.

24        So, he researched it and it was his idea to do the

25   QDRO which I don't know anything about, and, so, he did.

Page 58

1           BY MS. HEAD:

2       Q    And when Scott told you that your attorney must

3    have been an idiot, he was referring to your divorce

4    attorney?

5           MR. FICK:  Objection.

6           BY MS. HEAD:

7       Q    Do you know?

8       A    Ah, yeah.  Because we said, I said, we had no

9    assets because he'd taken off and I didn't know anything

10   about the retirement account.

11          MS. HEAD:  I'm going to mark this as Exhibit 12.

12                    (Deposition Exhibit No. 12 was

13                    marked.)

14          BY MS. HEAD:

15      Q    So, I've marked as Exhibit 12 an e-mail thread to

16   Cecily Sturge dated June 29th, 2016 bearing the Bates stamp

17   HAK-0015.  Do you remember this e-mail?

18      A    Not particularly but she and I had many

19   conversations and emails, this Katherine, Katherine Weisiger

20   at Hunton & Williams.

21      Q    And you see below she forwarded you an e-mail?

22      A    I see that now.  I didn't remember seeing it, but

23   I guess she forwarded it to me.  Stephanie should have

24   forwarded it to me.

25      Q    So, can I -- let me ask the question that I was

STURGE - 9/11/2019

Page 59

1    going to ask.  So, Ms. Weisiger forwarded to you an e-mail,

2    to Stephanie Velasquez, dated April 11th, 2014 which was an

3    earlier Exhibit we looked at; is that correct?

4        A    Yes.

5        Q    In the e-mail Katherine writes, "Thank you for

6    your call."  Do you remember what call she is referring to?

7        A    I had many calls with her.

8        Q    During what time period?

9        A    Whatever this says.  I don't know.  The year

10   before.  Two years before.  Once I found out about the

11   account I was trying to access it and she was very helpful.

12       Q    So, Stephanie Velazquez had emailed them in 2014

13   on your behalf; is that correct?

14       A    That's correct.

15       Q    And then after, during 2015, did you have contact

16   with Hunton & Williams about the retirement plan?

17       A    I believe I did.

18       Q    Was that all by phone?

19       A    Yeah, I didn't go there.

20       Q    Well, was it by e-mail?

21       A    It could be.  But I also spoke to her on the

22   phone.

23       Q    Did you save the emails from Hunton & Williams?

24       A    No.

25       Q    And then in 2016 we have this e-mail.  So, if you

                                                          Page 60

1    go down to the paragraph where it starts, "As indicated

2    below," do you see that?

3         A    No.

4         Q    On the first page toward the end of the paragraph

5    in the first e-mail, "As indicated below."

6         A    Okay.

7         Q    "As indicated below, the plan's fiduciaries need a

8    sworn affidavit attesting to the specific questions raised

9    in the e-mail and copies of supporting documents such as a

10   marriage certificate and any divorce decree."  Do you see

11   that?

12        A    I see it.

13        Q    So, did you ever supply the plan's fiduciaries

14   with a sworn affidavit?

15        A    I supplied them with whatever they asked for.

16        Q    Including a sworn affidavit?

17        A    That I don't recall.  I recall supplying them a

18   marriage certificate, divorce stuff, a lot of information.

19        Q    But you remember earlier in this e-mail they

20   requested a sworn affidavit attesting that you had no

21   knowledge of Mr. Wolas' whereabouts?

22        A    Katherine said that?

23        Q    It was in an earlier e-mail from Hunton &

24   Williams.  It was in the e-mail that Katherine forwarded.

25        A    Okay.

STURGE - 9/11/2019

Page 61

1    Q    But you never provided such a sworn affidavit to
2   Hunton & Williams?

3    A    Not that I recall.

4    Q    Why not?

5    A    I don't remember knowing anything about that.

6    Q    Okay.

7    A    They required a lot of information and I was
8   digging up information and I don't recall that being part of
9   it, or, doing that.

10    Q    They say they requested it in an e-mail in 2014.
11   They request the sworn affidavit again in an e-mail in 2016.
12   Did they request an affidavit in your phone calls with them?

13           MR. FICK:  Objection as to the compound pieces of
14   the question, but, go-ahead.

15           THE WITNESS:  I don't recall them asking me for
16   any of that.

17                         (Deposition Exhibit No. 13 was
18                          marked.)

19           BY MS. HEAD:

20    Q    I marked as Exhibit 13 an e-mail dated September
21   8th, 2016 from Cecily Sturge to Katherine Weisiger bearing
22   the Bates stamp HAK-0022.  Do you recognize this e-mail?

23    A    I think that I gave you her emails; didn't I?  I
24   don't recognize it specifically, but there were emails.

25    Q    Okay.  Did you write this e-mail?

STURGE - 9/11/2019

Page 62

1    A    I believe I did.

2    Q    It wasn't Scott Wolas who wrote it?

3    A    What date is it?

4    Q    September 8th, 2016.

5    A    No, I don't think he did.

6    Q    Did he ever write emails for you to send to

7    Katherine?

8    A    No.

9    Q    Did he ever tell you what to write in emails to

10   send to Katherine?

11   A    No.

12        MS. HEAD:  So, I've put in front of the witness an

13   Exhibit marked Exhibit 14, an e-mail dated September 8th,

14   2018 from Katherine Weisiger to Cecily Sturge.

15                        (Deposition Exhibit No. 14 was

16                        marked.)

17        BY MS. HEAD:

18   Q    Do you remember this e-mail?

19   A    No, but I'm sure it existed.

20   Q    So, if you go down in the second paragraph they

21   ask for a letter and in about the middle of that paragraph

22   there is a sentence that starts, "In your letter please

23   state whether or not to your knowledge Mr. Wolas is

24   deceased."  Do you see that?

25        A    I see that.

STURGE - 9/11/2019

Page 63

1      Q    So, as of September 8th, 2016, you were still

2  trying to obtain retirement benefits as a beneficiary to the

3  plan in the event of Mr. Wolas' death?

4           MR. FICK:  Objection.

5           THE WITNESS:  Yes.

6           BY MS. HEAD:

7      Q    But by September 8th, 2016 you knew Scott Wolas

8  was alive?

9      A    That's correct.

10          MS. HEAD:  I've put in front of the witness an

11  Exhibit marked Exhibit 15 which is a September 8th, 2016 e-

12  mail to Katherine Weisiger bearing the Bates stamp HAK-0026.

13                         (Deposition Exhibit No. 15 was

14                         marked.)

15          BY MS. HEAD:

16     Q    Do you remember this e-mail?

17     A    Not specifically, no.

18     Q    So, this is a continuation of the e-mail thread.

19  It has e-mail that we looked at before to you; do you see

20  that?

21     A    Okay.  Yeah.

22     Q    Hunton & Williams asked for a letter stating

23  whether or not to your knowledge Mr. Wolas was deceased.  Do

24  you see that in the middle of the page?

25     A    Or whether he is married to someone else.

STURGE - 9/11/2019

Page 64

1       Q    That's true.  Deceased or married to someone

2  else --

3       A    I see that.

4       Q    -- at the time of his death.

5            And you responded, "I will attend to this

6  immediately."

7       A    I see that.  I don't know if I did anything after

8  that.

9       Q    Right.  Did you attend to that immediately?

10       A    I don't know.

11       Q    You didn't tell Hunton & Williams that in fact

12  Scott Wolas was alive?

13       A    No, I did not.

14       Q    Do you know when you next contacted by Hunton &

15  Williams?

16       A    I have no idea.

17            MS. HEAD:  Can we go off the record for a second?

18            MR. FICK:  Sure.

19            (Whereupon, a break was taken from 12:02 p.m. to

20  12:13 p.m.

21            BY MS. HEAD:

22       Q    Can we turn back to what has been as Wolas Exhibit

23  4?  It is the notice of petition to modify.  It says,

24  "Notice of Petition," and it has the yellow sticker that has

25  a 4 on it.

STURGE - 9/11/2019

Page 65

1           So, if you turn to the second page above your

2   signature; that this your signature; right?

3      A    It looks like it.

4      Q    So, you say, "I certify that a copy of this

5   document will be caused to be served upon the respondent."

6   Do you see that?

7      A    Yes.

8      Q    And then you have the name of the respondent,

9   Scott Wolas, and you have the last known address as 23440

10  Mirabella Circle, Boca Raton, Florida.

11          Why did you list that address?

12     A    Because he partially owned it with me but he never

13  lived there.

14     Q    So, this was purchased before he disappeared?

15     A    Yes.

16     Q    And he never lived there?

17     A    Never.

18          MS. HEAD:  Okay.  So, we are on Exhibit 16.  I've

19  placed in front of the witness a document marked Exhibit 16

20  which is an e-mail with attachments.  The first page bears

21  the Bates No. of HAK-0027.  It is an e-mail dated December

22  29th, 2016 from Katherine Weisiger to Cecily Sturge.

23                      (Deposition Exhibit No. 16 was

24                      marked.)

25          BY MS. HEAD:

Page 66

1     Q    Do you see that?

2     A    I see it.

3     Q    Do you remember receiving this e-mail?

4     A    No.

5     Q    Katherine writes, "Cecily, as you requested

6  attached are the Model QDRO documents and summary plan

7  description for the Hunton & Williams LLP Retirement

8  Savings, Plan A."  Do you see that?

9     A    I see that.

10    Q    Did you make that request?

11    A    I don't recall.

12    Q    Did Scott Wolas make the request for the Model

13 QDRO?

14    A    I don't know.

15    Q    Do you recall if Scott Wolas told you to request a

16 Model QDRO from Hunton & Williams?

17    A    There was a model of what a QDRO is supposed to

18 look like that came from the company.

19    Q    If you look a the attachments, the next page

20 entitled, "Model Qualified Domestic Relations Order," for

21 the Hunton & Williams Retirement Savings Plan A," and below

22 that is instructions for the drafting attorney.  Do you see

23 that?

24    A    I see it.

25    Q    So, I'm wondering how you came to request, or, if

STURGE - 9/11/2019

Page 67

1   you can to request, a Model QDRO from Hunton & Williams?

2        A    I don't know.  I don't recall receiving a Model

3   QDRO.  I didn't know that they had a QDRO.  I assumed that

4   Scott had written the QDRO.

5             MS. HEAD:  I'd like to mark Exhibit 17.  I have

6   placed in front of the witness a document marked Exhibit 17

7   which is an e-mail to Cecily Sturge from Katherine Weisiger

8   dated January 5th, 2017 bearing the Bates stamp HAK-0102.

9             THE WITNESS:  I never wrote this.

10                        (Deposition Exhibit No. 17 was

11                        marked.)

12            BY MS. HEAD:

13       Q    Who wrote it; do you know?

14       A    I can only imagine that Scott wrote it, but I

15   didn't write it?

16       Q    Did Scott have access to your e-mail account?

17       A    No, he had, he might have known my e-mail address.

18   He had his own computer.

19       Q    Did he know, do you know if he knew, your password

20   or login information?

21       A    From my computer?

22       Q    Yes.

23       A    No.  He used his own.

24       Q    But for your, you have a Gmail account; is that

25   correct?

STURGE - 9/11/2019

Page 68

1      A    That's correct.

2      Q    For your Gmail account?

3      A    I don't know.  I don't recall him sending e-mails.

4      Q    But you didn't send this e-mail?

5      A    There is no way I sent this e-mail.

6      Q    How can you be so certain?

7      A    Because I'm not familiar with all those requests.

8  How would I have known to ask for these requests?  I have no

9  idea about them.  So, no, I didn't send this e-mail.

10          MS. HEAD:  So, I've placed in front of the witness

11  a document marked Exhibit 18 which is an e-mail dated

12  January 10th, 2017, Katherine Weisiger to Cecily Sturge --

13          THE WITNESS:  I never wrote this.

14          MS. HEAD:  -- bearing the Bates No. HAK-0104.

15                      (Deposition Exhibit No. 18 was

16                      marked.)

17          BY MS. HEAD:

18      Q    You see that it says "Cecily, the answer to your

19  questions are below.  Katherine."

20      A    I see that.

21      Q    Do you remember receiving this e-mail?

22      A    No.

23      Q    So, also attached to this e-mail, if you go two

24  pages in, is the document where we were talking about the

25  Model Qualified Domestic Relations Order with instructions

STURGE - 9/11/2019

Page 69

1    for the drafting attorney.  Do you remember ever seeing

2    that?

3         A    No.  I never knew she told them how to do it.  I

4    thought they just did it.  I never saw this before.

5              MS. HEAD:  This is now Exhibit 19.

6              I've placed in front of the witness a document

7    marked Exhibit 19 which is an e-mail dated January 16th,

8    2017 purporting to be from Cecily Sturge to Katherine

9    Weisiger bearing the Bates No. HAK-0115.

10                        (Deposition Exhibit No. 19 was

11                         marked.)

12             BY MS. HEAD:

13        Q    I can let you look at it more, or I can ask you

14   questions.

15        A    You can ask me questions.  I never wrote it.

16        Q    That was my question.  Did you write this e-mail?

17        A    No way.

18        Q    And if you look at the e-mail.

19        A    It doesn't say where the e-mail was sent to.

20   Emails are usually --

21        Q    It was sent to Katherine Weisiger at Hunton &

22   Williams and it purports to be from your e-mail address and

23   it was produced by Hunton & Williams, that's the Bates No.

24        A    Okay.

25        Q    So, in the text of the e-mail, and this is small

1    print, about six lines down it says, "I am advised the court

2    will act in approximately three weeks from the filing date."

3    Do you see that?

4         A    No.  Where is it?

5         Q    So, if you go six lines down in that first

6    paragraph --

7         A    I see it.

8         Q    -- the end, sorry, it is small.  "I am advised the

9    court will act in approximately three weeks from the filing

10   date."

11        A    I see that.

12        Q    Did you ever contact the court about filing the

13   QDRO?

14        A    I think that I filed it at the court.

15        Q    But did you call the court to ask about how long

16   it would take to grant it?

17        A    No.

18        Q    And you also see, if you look at the first

19   sentence, it says "Enclosed for review by the plan

20   administrator is a proposed QDRO."  Do you see that first

21   line?

22        A    I see that.

23        Q    And then within the body of the e-mail is

24   preliminary proposed QDRO.  Did you write that proposed

25   QDRO?

Page 71

1    A    No.

2    Q    Do you know who did?

3    A    I can only assume that Scott wrote it.

4         MS. HEAD:  Exhibit 20.  So, I've placed in front

5    of the witness a document marked Exhibit 20 which is an e-

6    mail purporting to be from Cecily Sturge to Katherine

7    Weisiger bearing the Bates stamp HAK-0117.

8                        (Deposition Exhibit No. 20 was

9                         marked.)

10        BY MS. HEAD:

11   Q    Did you write this e-mail?

12   A    No.

13   Q    Did you ever research the Florida statutes?

14   A    No.

15   Q    Do you know who wrote this e-mail?

16   A    I can only think that it is Scott, it couldn't be

17   anyone else.

18   Q    Was it Scott Wolas' idea to file the petition to

19   amend the divorce decree?

20   A    I made him aware that it existed, money, because I

21   didn't know about it and that I had been working on it and

22   had been in contact with Hunton & Williams to see if I could

23   access it.  And it was his idea about the QDRO and about

24   amending the document and the marriage and the divorce and

25   the whole thing.

STURGE - 9/11/2019

Page 72

1        Q      And did you help draft either the petition or the

2  affidavits that we looked at before?

3        A      I had no idea about what QDRO even was before

4  then.

5        Q      And the language in the petition to amend the

6  divorce decree in the pleadings that we looked at today, was

7  that Scott Wolas' language to your knowledge?

8        A      Yes.  Yes.

9        Q      It wasn't your language; was it?

10        A      No way.

11        Q      Did you at any time come to an agreement with

12  Wolas about the proceeds from the retirement account?

13        A      No.  He seemed interested in making sure that I

14  got it.

15        Q      Did you ever agree to split the proceeds from the

16  retirement account?

17        A      No.

18        Q      Did you understand in 2016 that your ex-husband,

19  Scott Wolas, could not get funds in the retirement account

20  without your help?

21              MR. FICK:  Objection.  You can answer.

22              THE WITNESS:  Say that again?

23              BY MS. HEAD:

24        Q      Did you understand in 2016 that your ex-husband

25  could not access the funds in the retirement account by

Page 73

1    himself?

2              MR. FICK:  Objection.  You can answer.

3              THE WITNESS:  I don't think he tried to by

4    himself.  Is that the question?

5              BY MS. HEAD:

6        Q    No.  You understood that Scott Wolas was a

7    fugitive; correct?

8        A    Correct.

9        Q    Alright.  So, if Scott Wolas, himself, had tried

10   to access the retirement account, he would have to expose

11   himself.  You understand that; correct?

12             MR. FICK:  Objection.  Go-ahead.

13             THE WITNESS:  I do understand that.

14             BY MS. HEAD:

15       Q    So, he would need your help to access that

16   retirement account; do you understand that?

17             MR. FICK:  Objection.

18             THE WITNESS:  I didn't help him.  I told him about

19   it.  He didn't know about it.

20             BY MS. HEAD:

21       Q    Well, you signed the papers that he drafted; is

22   that correct?

23       A    Yes.

24       Q    And you swore under penalties of perjury to the

25   statements in those papers?

STURGE - 9/11/2019

Page 74

1      A    That's true.

2      Q    To your knowledge was your son Tyler aware that

3   Wolas was alive in 2016?

4      A    Yes.

5      Q    Do you know when he became aware of that?

6           MR. FICK:  Objection.

7           THE WITNESS:  I don't.

8           BY MS. HEAD:

9      Q    To your knowledge was your son Tyler aware that

10   Wolas was alive in 2015?

11          MR. FICK:  Objection.  You can answer if you know.

12          THE WITNESS:  I don't know.

13          BY MS. HEAD:

14     Q    Do you have any reason to believe that your son

15   Tyler knew he was alive in 2014?

16          MR. FICK:  Objection.  You can answer if you know.

17          THE WITNESS:  I read somewhere that he visited

18   him, I think, in 2013.

19          BY MS. HEAD:

20     Q    So, in March 2017 it is your understanding that

21   Tyler knew that Scott Wolas was alive?

22          MR. FICK:  Objection.  You can answer.

23          THE WITNESS:  I believe so.

24          BY MS. HEAD:

25     Q    Do you recall attending a hearing in Florida State

Page 75

1   Court in 2017 related to the petition to amend the divorce

2   decree?

3       A    Yes.

4       Q    Was Tyler present at that hearing?

5       A    Yes.

6       Q    Did he represent you?

7       A    Yes.

8       Q    Do you recall if the magistrate judge requested

9   any additional documents from you at that hearing?

10      A    I don't recall.

11      Q    The hearing was after Scott Wolas was arrested;

12  correct?

13      A    Okay.  Yeah.

14      Q    Do you know?

15      A    I don't know.

16      Q    Do you know when Scott Wolas was arrested?

17      A    April.

18      Q    Do you know the day?

19           So, I'm putting in front of you an Exhibit which

20  is a letter dated April 20th, 2017 bearing the Bates No.

21  STURGE-0025.

22                         (Deposition Exhibit No. 21 was

23                         marked.)

24           BY MS. HEAD:

25      Q    Have you seen this letter before?

STURGE - 9/11/2019

Page 76

1      A    I think I have.  I think he went down and Scott

2  was in prison at the time, and he wrote it.

3      Q    So, the first, it is addressed to the magistrate;

4  do you see that?

5      A    Yup.

6      Q    And it is regard to the marriage proceedings, do

7  you see that in the RE: line?

8      A    Mm-hmm.

9      Q    So, the first sentence says, accompanying this

10  letter please find my proposed order affidavit of Scott

11  Wolas and supporting documents he requested at the hearing

12  taking place at the hearing on April 13th, 2017; do you see

13  that?

14      A    I see it.

15      Q    Does that in any way help you recall whether the

16  magistrate judge requested additional information at the

17  hearing?

18      A    I don't recall.  No.

19      Q    You're aware that Scott Wolas ultimately filed an

20  affidavit in the proceedings to amend the divorce decree;

21  are you?

22      A    I think so, yeah.

23      Q    Do you know why he did that?

24      A    He did that because he felt that the initial

25  divorce decree which he had never seen, that it should have

Page 77

1   been in there.

2        Q    So you don't know if the judge required an

3   affidavit from --

4        A    I don't recall what the judge required.

5             MS. HEAD:  I put in front of the witness two

6   Exhibits, Exhibit 22 and Exhibit 23.  Exhibit 22 bears the

7   Bates stamp STURGE-0001 and Exhibit 23 bears the Bates stamp

8   STURGE-0006.

9             THE WITNESS:  Yeah, we did this one before when

10  she said she went on vacation.

11                           (Deposition Exhibit No. 22 was

12                           marked.)

13                           (Deposition Exhibit No. 23 was

14                           marked.)

15            BY MS. HEAD:

16       Q    These two documents are documents from your

17  production.  Are you aware that on your behalf your attorney

18  produced documents in response to the Government's request?

19       A    Yes.

20       Q    So, if you look at the top of this, first, 22, it

21  says it is a forwarded conversation; do you see that?

22       A    Okay.  Got it.

23       Q    And above that it says from Cecily Sturge and that

24  is your e-mail address; is that correct?

25       A    It still is.

STURGE - 9/11/2019

Page 78

1   Q    To tylerwww@yahoo.com.  Do you know who that is?

2   A    That is my son, Tyler.

3   Q    Is that his e-mail address that he uses?

4   A    Yes.

5   Q    If you look at Exhibit 23, this also is a

6   forwarded message from your e-mail account; do you see that?

7   A    Mm-hmm.

8   Q    And this one is forwarded to

9   cameron77sturge@gmail.com.  Do you know whose e-mail address

10  that is?

11  A    I think that maybe Scott had that e-mail because

12  he used the name Cameron Sturge.

13  Q    Do you remember forwarding emails to him?

14  A    I don't.

15  Q    Below that you forwarded another e-mail to this

16  address; mfcorpserv@aol.com.  Do you know whose e-mail that

17  address is?

18  A    I think I do.  I think that it is Molly's e-mail,

19  but I'm just wondering why I would have sent this to her.

20  Q    Who is Molly?

21  A    Molly is a friend of mine who I play duplicate

22  bridge with and also I've worked for her.  She is elderly.

23  The only thing that I can think of is that at one time I

24  discussed this with her and she had suggested a lawyer for

25  me because I was looking for a lawyer to handle this.  And

STURGE - 9/11/2019

Page 79

1    that is the only reason I can imagine that I would forward

2    anything to her.

3        Q    If you go to the text of the e-mail, this is the

4    e-mail where Hunton & Williams asked you to please state

5    whether or not to your knowledge Mr. Wolas is deceased; do

6    you see that at the bottom of the first page?

7        A    Yes.

8        Q    And you actually then forwarded the e-mail to

9    Scott Wolas; correct?

10       A    I don't know.

11       Q    Well, you said cameron77sturge is Scott Wolas' e-

12   mail address?

13       A    I don't recall any of this.  I don't recall

14   sending anything to Molly and I don't recall this at all.

15       Q    Do you recall forwarding any emails to Scott

16   Wolas?

17       A    No.

18                         (Deposition Exhibit No. 24 was

19                         marked.)

20                         (Deposition Exhibit No. 25 was

21                         marked.)

22            THE WITNESS:  I think we did this one before.

23            BY MS. HEAD:

24       Q    Well, this is a longer e-mail.

25            I'm going to represent that these are all the

STURGE - 9/11/2019

Page 80

1   emails that you produced in your production.  So, 24,

2   Exhibit 24, bears the Bates No. STURGE-0064 to 0079 and it

3   contains a number of emails; do you see that?

4        A    Yup.

5        Q    So, I you turn to the page ending in 69, do you

6   see the second forwarded message, also to

7   cameron77sturge@gmail.com; do you see that?

8        A    Yeah, he must have had an e-mail.  I had forgotten

9   about it, but I guess he did.

10       Q    Okay.  That is one instance.  And then you turn to

11  the next page and there is another forwarded message to

12  cameron77sturge@gmail.com; do you see that?

13       A    Yup.

14       Q    And if you go to the next page there is another e-

15  mail forwarded to cameron77sturge@gmail.com; do you see

16  that?

17       A    Yup.  I see them all.

18       Q    And then on the page ending in 78, there is

19  another e-mail forwarded to cameron77sturge@gmail.com.  And

20  then on the last page there is another e-mail forwarded to

21  cameron77sturge@gmail.com.

22       A    I had forgotten.  Obviously he had an e-mail and

23  obviously I emailed this to him.

24       Q    So, that is five times that you forwarded emails

25  to him.

STURGE - 9/11/2019

Page 81

1        A    Oh, it could be ten.  I don't remember.

2        Q    And then if you go to Exhibit 25 to the page

3    ending in 6 you have another e-mail forwarded to

4    cameron77sturge@gmail.com.

5             MR. FICK:  I'm going to object to the assertion

6    that there is a cumulative -- because I think some of them

7    may be repeats of the same forwarded messages, but,

8    whatever.  The documents will show what they show.

9             BY MS. HEAD:

10       Q    Then if you go to the last two pages there are two

11   more indications that emails were forwarded.  So, it appears

12   that you forwarded a number of e-mails to Scott Wolas?

13       A    It appears that you're right.

14       Q    Do you recall receiving any emails from Scott

15   Wolas?

16       A    No.  I'd forgotten, I didn't know about this.  I'd

17   forgotten all about it until I can see that I sent him some

18   e-mails.

19            Do I remember getting some from him?  Is that what

20   you asked me?

21       Q    Yes.

22       A    I don't remember any of it.

23       Q    And all of these e-mails concern the retirement

24   plan; is that correct?

25       A    It appears to be.

STURGE - 9/11/2019

Page 82

1       Q     So, going back to the fall of 2016, you already

2   stated that Wolas contacted you in September of 2016.  Did

3   you also meet with him in person?

4       A     We met a couple of times at a restaurant.

5       Q     And do you remember when that was?

6       A     The dates?  No.

7       Q     Where, what restaurant?

8       A     I don't know.

9       Q     And when we were looking at the e-mail you

10  acknowledged that he used the name "Cameron Sturge."

11      A     Yes.

12      Q     And he was posing as your brother; is that

13  correct?

14      A     That is what he did.

15      Q     And he also said he was a paleontologist?

16      A     Well, he didn't tell me that because I know he's

17  not.

18      Q     In November of 2016 did you speak to an Air B&B

19  host about a place for Wolas to stay?

20      A     I believe I did.

21      Q     And about November 16th did you and Wolas meet

22  with the Air B&B host?

23      A     Perhaps, yes.

24      Q     Perhaps?  Do you remember?

25      A     I remember being some place where he was staying,

STURGE - 9/11/2019

Page 83

1    I think maybe I dropped him off.

2         Q    Do you remember actually talking to an Air B&B

3    host --

4         A    There was some woman there.

5         Q    -- and saying that Scott Wolas was Cameron Sturge

6    and was your brother?

7         A    I never said that.  He said that.

8         Q    Did you contradict him?

9         A    I said nothing.

10        Q    And later in November did an FBI agent and a

11   Quincy police officer interview you about Scott Wolas?

12        A    Yes.

13        Q    And they were trying to located Wolas; correct?

14        A    Sure.

15        Q    And they had asked if you had any contact with

16   Wolas?

17        A    That's correct.

18        Q    And you said no?

19        A    That's correct.

20        Q    And that was a lie?

21        A    That's correct.

22        Q    And you also told the FBI that you didn't know how

23   to reach Wolas; is that correct?

24        A    I don't recall if I told him I didn't know how to

25   reach him.                   QBut you did know how to reach him?

STURGE - 9/11/2019

Page 84

1        A     I don't remember being asked that.

2        Q     But, did you at the time of the interview know how

3   to reach Scott Wolas?

4        A     Ah, yeah.

5        Q     Did you tell the FBI you didn't know his

6   whereabouts?

7        A     I'm sure I did.

8        Q     And that was a lie as well?

9        A     Well, I didn't know exactly where he was, but I

10  knew he was in Florida but I did not share that with them.

11       Q     Well, you know he was at an Air B&B that you

12  helped rent for him; didn't you?

13       A     Yes.

14       Q     So, it was a lie to say you didn't know here he

15  was located?

16       A     I don't know how long he was at that Air B&B, or

17  what the dates were, so, I didn't outwardly lie to the FBI

18  knowing he was at an Air B&B and say I didn't know where he

19  was.  I don't know exactly when he was there.

20       Q     After the FBI interviewed you, you continued to

21  communicate with Wolas; didn't you?

22       A     Yes.

23       Q     How often did you communicate with him?

24       A     Not often.  He was writing these things.

25       Q     And what were you discussing when you talked with

Page 85

1    him?

2         A      Mostly, you know, information about the QDRO that

3    he was working on.  Also, he was trying to get a job.  I

4    think he had applied to maybe some bartending jobs.  He also

5    -- he was trying to get employed.

6         Q      Do, during this time you spoke to Wolas on the

7    phone, during this time after the FBI interviewed you and

8    before he was arrested you spoke to Wolas on the phone, and

9    you met in person; is that correct?

10        A      That's correct.

11        Q      Did you exchange any texts with him?

12        A      I don't know if he texts?  I don't know.

13        Q      And you never contacted the FBI and told them

14   about Wolas' whereabouts during this time period?

15        A      No, I did not.

16        Q      Before September 2016 had you had contact with

17   Wolas in that year?

18               MR. FICK:  Objection.

19               THE WITNESS:  Perhaps.

20               BY MS. HEAD:

21        Q      Do you remember one way or the other?

22        A      I don't recall.

23        Q      Did you have contact with Scott Wolas in 2015?

24        A      I don't recall.  Occasionally, I would hear from

25   him.

Page 86

```
 1      Q     So, after Wolas was arrested you spoke to him in
 2   prison; correct?
 3      A     Yes, I did.
 4            MS. HEAD:  I've place in front of the witness
 5   Exhibit 26 which is a transcript of a telephone call that
 6   was also submitted in this case.  It is document 83-1.
 7                        (Deposition Exhibit No. 26 was
 8                        marked.)
 9            BY MS. HEAD:
10      Q     Ms. Sturge, this is a transcript of a telephone
11   call that you had with Scott Wolas.
12      A     So, I see.  Yes.
13      Q     Do you recall speaking to him --
14      A     Yes, I do.
15      Q     -- on or around April 8th, 2017?
16      A     I know he called me from prison.
17      Q     And he called you collect?
18      A     Yeah, I guess he did.
19      Q     On page 5, can you turn to page 5?  If you just
20   want to review that page for me?
21            MR. FICK:  Page 5 of the ASF number or page 5 of
22   the transcript?
23            MS. HEAD:  It would be page 5 of the transcript,
24   page 6 of 19 of the ACF number.
25            BY MS. HEAD:
```

Page 87

1     Q    Did you review page 5?

2     A    I'm reviewing it now.

3     Q    Okay.  Thank you.

4          I just wanted to ask you about some of the

5  discussion on page 5.

6     A    There is not much of a discussion.  It doesn't get

7  to any subject.  I don't know even what it says.

8     Q    Page 5, in the first part Wolas is referring to a

9  project; do you see that?

10    A    Yes.

11    Q    Do you know what he is referring to?

12    A    Well, he had a couple of projects, so, the answer

13  is no.

14    Q    And if you go down you state, "well, as I recall

15  there were, I was supposed to bring something in triplicate

16  and I don't even know what that is."

17    A    I still don't know what that is.  I have no idea.

18    Q    You don't know if that was about the petition to

19  amend the divorce decree?

20    A    I don't know.  I thought it was all done by then.

21    Q    Well, the hearing was on April 13, 2017 as we saw

22  in Tyler's letter.

23         Do you remember speaking to Scott Wolas in prison

24  about what to do with regard to the petition to amend the

25  divorce decree?

STURGE - 9/11/2019

Page 88

 1      A    I do not.  I thought I had been, by the time he

 2  was in prison, I thought it had been done.

 3      Q    Can you turn to page 11 of the transcript?

 4  Actually, turn to page 10 if you wouldn't mind.  Can you

 5  review page 10, and the top of page 11 for me?

 6      A    It looks like he is instructing me about papers

 7  that he said I had and about doing them in triplicate.

 8      Q    And those papers being the motion to amend the

 9  divorce decree?

10      A    Yeah, but I thought that was already done.  I'm

11  not sure.

12      Q    And on page 10 he asks, in the middle of the page

13  at line 12 and 13, he tells you, "Don't talk to anybody."

14  Did you see that?

15      A    I did see that.

16      Q    And you respond, "Who would I talk to?"

17      A    I see that.

18      Q    And he says, "Someone may come to you.  Okay.

19  They may come to you."

20      A    Who?

21      Q    Well, I was going to ask you.  Do you have an

22  understanding of who he was referring to with "they?"

23      A    No.  The whole page does not really give much

24  information.

25      Q    And then at the top of page 11, line 2, you say,

STURGE - 9/11/2019

Page 89

1    "I would never tell anybody anything anyway."

2         A    I see that.

3         Q    And you said that?

4         A    It says that I did.

5              "Notice of petition, the petition, a supplemental

6    affidavit."

7         Q    And those are the documents that we looked at

8    earlier?

9         A    Mm-hmm.

10             MS. HEAD:  I'd like to take a brief break.

11             (Whereupon, a break was taken from 1:10 p.m. to

12   1:16 p.m.)

13             BY MS. HEAD:

14        Q    You're aware that Scott Wolas was eventually

15   arrested on April 7th, 2017?

16        A    I think we discussed that.

17        Q    Yes.

18        A    Before the date of Scott Wolas' arrest, did you

19   ever have discussions with Tyler Wolas about the QDRO?

20             MR. FICK:  You know I'm going to object on

21   privilege grounds to the extent that he is a lawyer and

22   represented her in connection with this stuff.

23             MS. HEAD:  Okay.  He didn't file his appearance

24   until the date of, but I take your concern and caution.

25             BY MS. HEAD:

Page 90

1     Q     So, from the e-mails that we looked at, there was

2  a time when you were --

3     A     These are phone calls now.

4     Q     I'm not talking about that right now.  I'm talking

5  about the documents that we've looked at this morning and

6  early this afternoon.  It appears that you were initially

7  trying to gain access to the retirement account by claiming

8  that Scott Wolas was dead; is that fair?

9     A     That's right.

10    Q     And then at some point you shifted to trying to

11 get access to the retirement account by amending the divorce

12 decree with a QDRO?

13    A     Yes.

14    Q     What caused this shift?

15    A     It was Scott's idea.  I never heard of a QDRO.  It

16 was his idea.  It was a way that he thought he could help me

17 get the money.

18    Q     What kind of computer did you have in this 2016,

19 2017 time period?

20    A     I don't recall.

21    Q     Do you recall what kind of computer Scott Wolas

22 had?

23    A     No idea.

24    Q     Do you recall what kind of phone you had?

25    A     I think just my cell phone.

STURGE - 9/11/2019

Page 91

1     Q     Was it an Apple phone or --

2           MR. FICK:  Wasn't it ceased in her case?

3           MS. HEAD:  It may have been.

4           THE WITNESS:  No.  No one took my phone.

5           MR. FICK:  No?  Okay.

6           BY MS. HEAD:

7     Q     And you were eventually charged with, and pled

8     guilty to the charge of making a false statement to the FBI?

9     A     That's correct.

10    Q     And you were represented by counsel when you pled

11    guilty; correct?

12    A     Correct.

13    Q     And that counsel was Anthony Fuller?

14    A     Yes.

15    Q     And are you aware that your attorney submitted a

16    sentencing memorandum in conjunction with your guilty plea?

17    A     I don't know what that all means.

18    Q     Okay.  I'll show it to you.

19          MS. HEAD:  I've put in front of the witness a

20    document marked Exhibit 27 which is defendant's Cecily

21    Sturge's sentencing memorandum filed in the case, United

22    States of America verses Cecily Sturge.

23                          (Deposition Exhibit No. 27 was

24                          marked.)

25          BY MS. HEAD:

STURGE - 9/11/2019

Page 92

1     Q   Have you seen this document before?

2     A   I don't know.  Should I have seen this before?  I

3 don't know.

4     Q   I want to direct your attention to a statement on

5 page 8 specifically the first full paragraph.  "Ms. Sturge

6 lied in the spur of the moment in an act of self-

7 preservation.  Wolas had recently contacted her dangling the

8 prospect of her taking possession of at least a portion of

9 his $647,000 retirement account that he --"

10    A   That's really not true because he didn't now about

11 it, so, that's really not correct here.

12    Q   Was there ever a discussion between you and Mr.

13 Wolas about you taking a portion?

14    A   You've already asked me this.  No.

15    Q   No?

16    A   And this is wrong.

17    Q   Wolas didn't promise you any portion of the

18 retirement account?

19         MR. FICK:  Objection.  You can answer.

20         THE WITNESS:  He wrote all this stuff up to try

21 and get it for me.  We all know that; right?  So, what's the

22 question?

23         BY MS. HEAD:

24    Q   Whether you had an agreement with Scott Wolas on

25 how to divide the retirement account.

STURGE - 9/11/2019

Page 93

1     A     There was no agreement.  There was no agreement

2  that he wanted any part of it.  He obviously could go and

3  make and steal as much money as he wanted to.  He had no

4  interest in the retirement account.  I'd like to feel that

5  he felt a little guilty and wanted me to have it.  That's

6  all I know.

7     Q     So, you don't think he was going to take any

8  portion of the retirement account from you when he got it?

9     A     No.

10          MS. HEAD:  I think I'm done.

11          MR. FICK:  I'm not going to ask any questions.

12          (Whereupon, at 1:16 p.m. the deposition was

13  concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

STURGE - 9/11/2019

Page 94

1                    C E R T I F I C A T E

2   COMMONWEALTH OF MASSACHUSETTS  )
                                   )  SS.
3   COUNTY OF SUFFOLK              )

4          I, Gailann Socia Kimbrough, a Court Reporter and

5   Notary Public, within and for the Commonwealth of

6   Massachusetts, do hereby certify that there came before me

7   on this 11th day of September, 2019, the person hereinbefore

8   named, who was by me duly sworn to tell the truth, the whole

9   truth, and nothing but the truth, concerning and touching

10  the matter in controversy in this cause; that she was

11  thereupon examined upon she oath, and she examination

12  reduced to typewriting, under my direction, and that this

13  deposition transcript is a true and accurate record of the

14  testimony given by the witness.

15         I further certify that I am not related to any of

16  the parties hereto or their counsel, and that I am in no way

17  interested in the outcome of said cause.

18         Dated at Boston, Massachusetts, this 16th day of

19  September, 2019.

20

21                        _____

22                        Gailann Socia Kimbrough

23                        NOTARY PUBLIC

24

25

STURGE - 9/11/2019

Page 95

1                           CORRECTION SHEET

2                    DEPOSITION OF CECILY STURGE

3    PAGE NO.  LINE NO.  SUGGESTED CORRECTION

4    _____   _____   _____

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   _____   _____   _____

STURGE - 9/11/2019

Page 96

1    SIGNATURE OF WITNESS:

2              I have read the foregoing transcript and the same

3    contains a true and accurate recording of my answers to the

4    questions therein set forth, subject to the change and/or

5    correction sheet(s) attached.

6

7

8                             _____

9                             Deponent

10

11