UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES of AMERICA                )
                                        )        **Criminal Action No.**
            v.                          )        **17-10198-FDS**
                                        )
SCOTT J. WOLAS,                         )
                                        )
            Defendant.                  )
_____)
                                        )
CECILY STURGE,                          )
                                        )
            Petitioner.                 )
_____)


**MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

SAYLOR, C.J.

This is an ancillary proceeding brought by petitioner Cecily Sturge pursuant to 21 U.S.C.

§ 853(n)(2) to determine the validity of her interest in a retirement account ordered forfeited to

the United States.

Scott Wolas is a former partner in the New York office of a major law firm.  In the mid-

1990s, he participated in a pyramid scheme that bilked investors of more than $100 million.  In

1996, the scheme collapsed, and he became a fugitive.  While a fugitive, and using an assumed

name, he perpetrated a second fraudulent scheme in Massachusetts between 2014 and 2016.

Eventually, in April 2017, after more than twenty years on the run, he was arrested and charged

in this court in connection with the second scheme.  On June 29, 2018, he pleaded guilty to seven

counts of wire fraud and one count each of aggravated identity theft, misuse of a social security

number, and tax evasion.

When Wolas became a fugitive, he left behind a wife, Cecily Sturge, and a son.  Sturge and her son had sporadic communications with Wolas while he was a fugitive.  She eventually obtained a divorce in Florida, where she had moved, in 2001.  In 2011, a different Florida court declared Wolas dead, even though he was alive and indeed in contact with his family.

Wolas also left behind a retirement account at the law firm that is now worth more than $700,000.  That asset was not brought to the attention of the Florida divorce court, and therefore was not addressed in the divorce decree.  There is substantial evidence that Sturge was aware of the existence of the asset at the time of the divorce, and in fact had twice contacted the law firm about transferring it to her, although her efforts were not successful.

By 2016, Wolas and Sturge were in regular contact, both by telephone and in person.  Wolas devised a plan to petition the Florida court for a Qualified Domestic Relations Order ("QDRO") transferring the retirement account to Sturge.  The petition and accompanying affidavit stated, among other things, that Sturge did not know Wolas's whereabouts, which was untrue; in fact, he physically accompanied her when she signed the affidavit before a notary public.

The Florida court had not yet acted on the petition when Wolas was arrested in April 2017.  Wolas and Sturge continued to discuss the transfer of the retirement account over jail telephones.  Eventually, in May 2017, the court issued the QDRO transferring the retirement account to Sturge.

In June 2017, at the request of the government, this Court entered a restraining order preventing the transfer of the assets.  In November 2018, the Court entered a preliminary order of forfeiture ordering that the retirement account be forfeited to the United States.  Sturge now challenges that forfeiture, contending that she has a valid interest in the retirement account that is

superior to that of the United States.

After a period of discovery, both parties have moved for summary judgment.  In substance, the government contends that the Court should issue a final order of forfeiture because the transfer of the retirement account to Sturge was a fraudulent transfer, and therefore voidable under the Florida Uniform Fraudulent Transfer Act.  Sturge contends that the transfer was not fraudulent, among other reasons because it took place before the government had an interest in the account.

For the reasons stated below, the government's motion for summary judgment will be granted, and the petitioner's motion for summary judgment will be denied.

## I.     Background

### A.     Factual Background

The following facts are undisputed except as otherwise noted.

#### 1.      The Creation of the Retirement Account

Scott Wolas and Cecily Sturge were married on October 12, 1982.  (Ex. 7, ¶ 2).[1]  They have one son from the marriage, Tyler Wolas.  (Ex. 2 ("Sturge Dep.") at 11-12).

From 1989 to 1995, Wolas was a partner in the New York office of the law firm formerly known as Hunton & Williams LLP.  (Ex. 3 ("Weisiger Dep.") at 20).[2]  While at Hunton & Williams, he participated in the Hunton & Williams Retirement Savings Plan (the "Retirement Plan") by making contributions to a retirement account (the "Retirement Account").  (*Id.* at 14-15, 16, 18).  His interest in the Retirement Account vested in approximately 1994.  (*Id.* at 35,

---

[1] References to "exhibits" are to the exhibits to the affidavit of Carol Head unless otherwise noted.

[2] Hunton & Williams LLP became Hunton Andrews Kurth in 2018.  (*Id.* at 13).

36).

Wolas designated Sturge as the primary beneficiary on the Retirement Account. (Ex. 1 ("Wolas Dep.") at 9-10).[3] Sturge was not a participant herself and did not make any contributions to the account. (Weisiger Dep. at 31, 32).

During their marriage, Wolas and Sturge lived together in Westchester County, New York. (Sturge Dep. at 10). Sturge moved to Boca Raton, Florida, in approximately 1989. (*Id.* at 11, 13). She and Wolas began living separately at about that time. (*Id.* at 11, 12). She knew that he continued to work at the law firm after their separation. (*Id.* at 11, 54).

The funds in the Retirement Account have never been distributed. As of September 2019, the account had a balance of more than $788,000. (Weisiger Dep. at 26).

### 2.    Wolas's First Criminal Scheme and Flight from Justice

While at Hunton & Williams, Wolas participated in a pyramid scheme that defrauded investors of an estimated $100 million or more. (Bell Aff. (Dkt. No. 3) ("Bell Aff. 1") ¶ 27). He fled New York in 1996 or 1997, becoming a fugitive. (*Id.*; Bell Aff. (Dkt. No. 130-2) ("Bell Aff. 2") ¶ 10). In 1997, he was indicted on 119 counts of fraud and grand larceny by the New York District Attorney's Office. (Bell Aff. 1 ¶ 27; Bell Aff. 2 ¶ 10). That criminal proceeding appears to remain pending. (Bell Aff. 1 ¶ 27).

Sturge was aware that criminal charges had been filed against her husband and that he

---

[3] The Plan Document governing the Retirement Plan provides that it may be amended at any time for any reason, prospectively or retroactively. (Ex. 5 at 3). The Plan added a new provision in 2018 that a designation of a spouse as a beneficiary made by a participant automatically becomes ineffective as of the date that the participant and spouse become divorced. (*Id.* at 2; Weisiger Dep. at 33-34). That provision applies to any living participant, regardless of when the divorce took place. (Weisiger Dep. at 34-35).

was a fugitive from justice.  (Sturge Dep. at 15-16, 19-21).[4]

After Wolas became a fugitive in 1996 or 1997, Sturge had occasional telephone contact with him.  (*Id.* at 37).  As set forth below, beginning in about 2016, she had regular telephone contact with him, and met with him in person on at least three occasions.  (*Id.* at 37, 47, 82-83).  Her son Tyler also had telephone contact with him, and met him in person at least once, in 2013.  (*Id.* at 21-22, 37-38; Wolas Dep. at 19-20).

### 3.   Contacts with the Retirement Plan in 1997 and 2000

Katherine B. Weisiger is the Retirement Manager for the law firm, and has helped to administer the Retirement Plan since 1987.  (Weisiger Dep. at 13, 14).

Weisiger testified that a woman who identified herself as Cecily Sturge first called her in 1997.  (*Id.* at 43).  The woman told her she believed her husband, Scott Wolas, was dead, and asked how she could obtain the funds in the Retirement Account.  (*Id.* at 43, 14).  Weisiger told her that "there was a certain procedure and a set number of years would need to elapse before we could do anything related to the account."  (*Id.* at 43-44).

Weisiger further testified that the same woman called again in February or March 2000, and said "she was again calling to request how to obtain the funds in her husband's account."  (*Id.* at 44-45, Ex. 10).[5]

On March 31, 2000, Weisiger sent a letter to Sturge at her home address in Florida.  (Ex. 11; Weisiger Dep. at 44; 47-49).  The letter began, "As we have discussed, you are the

---

[4] She testified that she learned about the criminal charges against her husband by reading about them in a newspaper in the late 1990s and by speaking to a girlfriend of hers who worked at a law firm.  (*Id.* at 15-16, 19-21).

[5] Weisiger sent an e-mail to another person at the firm on March 5, 2000, that stated as follows:  "I have heard from Scott Wolas's wife again.  I need to call her and tell her that she has to have him declared dead by a court before we can proceed; however, you mentioned that there was an issue you wanted to check on first."  (Ex. 10).

beneficiary of your husband's account under the Hunton & Williams Retirement Savings Plan."
(Ex. 11 at 1).  The letter explained that "[u]nder Virginia law, a missing person is presumed dead
after seven years.  (*Id.*).  At the appropriate time, you will need to go to court to have [Wolas]
declared dead."  (*Id.*)  It also gave the market value of the fund as of that date (more than
$209,000) and stated that it was invested in a mutual fund.  (*Id.*).

Sturge disputes that she "communicated with anybody at Hunton & Williams" in "any
capacity" before 2001.  (Sturge Dep. at 25).  She acknowledged, however, that the March 2000
letter was sent to the address where she was living at the time.  (*Id.* at 25).[6]  She said she did not
"recall" receiving the letter, although she also testified that she "didn't get letters from
[Weisiger]."  (*Id.* at 26).  She also testified that she did not "remember" having a phone call with
the law firm during that time period.  (*Id.*).

For his part, Wolas testified that he "had no contact with the plan administrator [after]
1995."  (Wolas Dep. at 23).

## 4. The 2001 Florida Divorce Proceeding

On August 23, 2001, Sturge filed a petition for divorce from Wolas with the Circuit
Court in Palm Beach County, Florida.  (Ex. 8 at 3).  Sturge was represented by counsel
throughout the proceeding.  (Ex. 7 at 2; Sturge Dep. at 28).

With the divorce petition, Sturge filed a financial affidavit in which she was required,
among other things, to list various assets of her and her husband.  (Ex. 9).  She listed no assets in
the column for "Husband."  (*Id.* at 2).  Specifically, she listed nothing under the sections for
"Pension Fund IRA," "Retirement Fund," or "Other Assets."  (*Id.*).  She signed the affidavit

---

[6] There is no evidence in the record that the letter was returned as undeliverable.

under penalty of perjury.  (*Id.* at 6).

Neither Sturge nor her lawyer made any effort to try to locate any assets of Wolas in connection with the Florida divorce proceeding.  (Sturge Dep. at 33-34).  The law firm never received a request for information about the Retirement Account in connection with that proceeding.  (Weisiger Dep. at 42-43).

On November 13, 2001, the Circuit Court of Palm Beach County, Florida, issued a judgment dissolving the marriage.  (Ex. 7).[7]

The divorce decree stated, among other things, that "the Court reserves jurisdiction of the parties and the subject matter hereof to make such further orders as may be necessary"; the parties "[did] not own any marital assets which would require equitable distribution"; and "[Wolas] shall be responsible for all debt incurred in his name during the course of the marriage and shall be responsible for all joint debt incurred during the marriage."  (Ex. 7 ¶¶ 8-9, 10(c)-10(d)).

Sturge did not object to the finding of the court that the parties did not own any marital assets.  (Sturge Dep. at 36).  She did not take any steps to amend the divorce decree within the one-year period following its issuance.  (*Id.*).

### 5.       The Petition for a Declaration of Death

At some point, a petition was filed with the Circuit Court of Manatee County, Florida, to have Wolas declared dead.  (Ex. 13).  The petition was apparently filed by someone named Robert M. Elliott.  (*Id.* at 3).  It is unclear whether Sturge was involved in the filing of the petition, or was aware of its filing at the time.

On October 5, 2011, the Florida court granted the petition and issued an "Order of

---

[7] A default judgment was entered against Wolas in the divorce proceeding.  (Ex. 7).

Determination of Death" decreeing that Wolas was deceased.  (*Id.*).

### 6.       Contacts with the Retirement Plan in 2014-2016

In January 2014, Sturge and her attorney, Stephanie Velasquez—who is married to her

son Tyler—contacted the Retirement Plan about obtaining the contents of the Retirement

Account.  (Sturge Dep. at 41; Weisiger Dep. at 49, 50; Ex. 12).  The stated basis of that claim

was that Wolas was dead.  (Exs. 13, 14).  In February 2014, attorney Velasquez provided a copy

of the October 2011 Order of Determination of Death from the Florida court.  (Ex. 13).

In response, on April 11, 2014, the Retirement Plan sent an e-mail to Ms. Velasquez.

(Ex. 14).  The Plan requested confirmation of certain facts "to ensure that the Plan is paying the

correct beneficiaries under both applicable law and the terms of the Plan."  (*Id.* at 2).[8]  Among

other things, the Plan requested that Sturge provide a sworn affidavit attesting "that she had and

has no knowledge of Mr. Wolas['s] whereabouts during the period from October 5, 2006, to the

date of the affidavit."  (*Id.*).

Sturge did not provide such an affidavit, nor did she respond to the e-mail.  (Weisiger

Dep. at 59, 61; Sturge Dep. at 44).

Although Velasquez was claiming Wolas was dead, she was likely aware that the claim

was false.  As noted, her husband, Tyler Wolas, was in sporadic telephone contact with Wolas,

and had seen him in person in 2013.  (Wolas Dep. at 19-20).

On September 8, 2016, Sturge sent Weisiger an e-mail asking for the status of her claim

to "the retirement benefits."  (Weisiger Dep. at 69; Ex. 16).  That day, Weisiger responded,

---

[8] The e-mail noted that "Ms. Sturge contacted the Plan administrator in 1997 asserting that Mr. Wolas had disappeared and was likely dead.  At the time, the Plan administrator provided Ms. Sturge information regarding timeframes for legal proceedings to declare a person dead.  The Plan Administrator received no further correspondence from or on behalf of Ms. Sturge until you recently contacted the plan."  (Ex. 14 at 1).

stating that "[t]he Plan's fiduciaries will handle your request as a claim for benefits in accordance with the Plan's claim procedures." (Ex. 17 at 1). She requested that Sturge provide a letter "[stating] to her knowledge whether or not [Wolas] was deceased" and whether or not he "was married to someone else at the time of his death." (*Id.*).

Sturge responded by e-mail, "I will attend to this immediately." (Sturge Dep. at 63-64). She did not, however, provide the requested letter, or otherwise respond. (Weisiger Dep. at 71).

Sturge does not dispute that as of September 8, 2016, she knew that Wolas was alive, even though she was trying to obtain access to the Retirement Account by claiming that he was dead. (Sturge Dep. at 63). Indeed, by September 2016, Sturge and Wolas were in regular contact by telephone. (Bell Aff. 2, ¶¶ 14-15, 19). According to telephone records, she and Wolas spoke 62 times between October 8 and November 22, 2016. (*Id.* ¶ 20). They also met at least three times in person. (*Id.* ¶¶ 21-24; Sturge Dep. at 82).

On November 17, 2016, Sturge was interviewed by an FBI agent and a local police officer concerning Wolas. (Sturge Dep. at 83-84; Bell Aff. 2 ¶ 16). She lied and told them she had no contact with him and did not know his whereabouts. (Sturge Dep. at 83-84; Bell Aff. 2 ¶ 16).

Eventually, in June 2017, Sturge was indicted for making a materially false statement to the FBI in violation of 18 U.S.C. § 1001. *United States v. Sturge*, 17-cr-10197-PBS (Dkt No. 22). She pleaded guilty to that charge in January 2018 and received a sentence of probation. *Id.* (Dkt. Nos. 64, 91).

### 7.    Wolas's Second Criminal Scheme

Between 2014 and 2016, Wolas—who was living in Massachusetts under a false name—committed another series of financial crimes. As part of the scheme, he solicited approximately

$1.9 million from approximately twenty individuals to invest in real estate projects. (Superseding Information ¶¶ 6, 10).  He signed contracts with the investors in which he represented that they would receive their principal investment plus interest back and/or a share of the profits once he sold the property.  (*Id.* ¶ 7).  The profits he promised the investors exceeded 100% of the profits earned from the sale of the properties.  (*Id.* ¶ 8).  He also verbally assured the investors that their money would be used exclusively for construction and other expenses related to developing the properties.  (*Id.* ¶ 9).

None of the investors ever received any of their principal back or made any return on their investments.  (Rule 11 Hearing, 26-29).  Instead of investing the funds in the real-estate projects, Wolas used most of the funds on personal and other expenses unrelated to the development of the projects.  (*Id.* at 25; Superseding Information ¶ 11).  On September 8, 2016, he fled Massachusetts, and ceased all contact with the investors.  (Rule 11 Hearing at 26).

On April 4, 2017, a criminal complaint was filed against Wolas in the District of Massachusetts.  (Dkt. No. 3).  Three days later, on April 7, he was arrested.  (Bell Aff. 2 ¶ 29).  At that point, he had been a fugitive for more than twenty years.

At his initial appearance in federal court, on April 7, 2017, Wolas testified that he had no funds or assets, of any kind, anywhere in the world.  (Ex. 24 at 10).  At that time, the Retirement Account had a balance of more than $600,000.  (Bell Aff. 2, ¶ 36).

**8.      The Scheme to Obtain a QDRO**

According to Sturge, at some point—beginning in 2016, while he was still a fugitive—Wolas came up with the idea to amend the 2001 divorce decree to distribute the Retirement Account to her.  (Sturge Dep. at 90, 71).  His plan was to obtain a QDRO from a Florida court to

transfer the Retirement Account to her.  (*Id.*).[9]

On December 28, 2016, Sturge called Weisiger and left a voicemail.  (Weisiger Dep. at 71, 74).  They spoke by telephone the next day; during the call, Sturge informed her that "she was now going to proceed with doing a Quadro [sic]."  (*Id.* at 71-72).

Weisiger then e-mailed Sturge a number of documents, including a model QDRO document.  (Ex. 18).  On January 5, 2017, Sturge responded with a list of questions.  (Ex. 19).  Wolas, in fact, had drafted that e-mail.  (Sturge Dep. at 67, 71).[10]  He also prepared a draft QDRO that was sent to the law firm from Sturge's e-mail address on January 16, 2017, which counsel for the Plan revised and sent back.  (*Id.* at 69; Weisiger Dep. at 76-78; Ex. 21).

Wolas drafted various documents to be filed in the Florida court to obtain a QDRO and transfer the Retirement Account to Sturge, including a notice of petition, a petition, a supporting affidavit, and a preliminary proposed QDRO.  (Wolas Dep. at 10-11; Sturge Dep. at 49-50; Ex, 22).

A petition to obtain a QDRO and various accompanying documents, including the affidavit, were filed in the Circuit Court for Palm Beach County, Florida, on February 8, 2017.  (Ex. 22).  The petition sought a QDRO to distribute the Retirement Account to Sturge.  (*Id.*).  Both the petition and the affidavit were signed by Sturge under oath.  (*Id.* at 6, 12).  The petition stated that the 2001 divorce decree "mistakenly state[d] that there was no marital property subject to equitable distribution."  (*Id.* at 5).

Among other things, Sturge swore under oath that she was unaware of the existence of

---

[9] A QDRO is, in part, a "domestic relations order . . . which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan."  *DeSantis v. DeSantis*, 714 So. 2d 637, 638 (Fla. Dist. Ct. App. 1998) (quoting 29 U.S.C. § 1056(d)(3)(B)(i)).

[10] Wolas and Sturge were in e-mail contact at that point.  (*Id.* at 78, 80-81).

the Retirement Plan at the time of the divorce in 2001; that Wolas's "whereabouts are unknown"; and that she had had no contact with him since 1995.  (*Id.* at 8, 10, 11).  On March 30, 2017, she filed a supplemental affidavit containing essentially the same information.  (Ex. 23).

Again, at the time Sturge swore to those facts, she was in regular contact with Wolas. Thus, she now admits that her statements to the court were in part untrue.  (Sturge Dep. at 53). Indeed, Wolas was actually with her on February 8, 2017, when she went into a bank in Florida to sign the February 8 affidavit before a notary public.  (*Id.* at 56-57; Bell Aff. 2 ¶ 34).  Between February 1 and March 26, 2017, Wolas and Sturge had at least 45 contacts by telephone or text message.  (Bell Aff. 2 ¶¶ 26-28).

The court had not yet acted on the petition by the time of Wolas's arrest in April 2017. On April 8, 2017, the day after his arrest, he and Sturge spoke over the jail telephone about what she needed to do to "follow through" on "the project"—that is, to obtain the QDRO.  (Ex. 25 at 11; Bell Aff. 2 ¶ 37).  Wolas reminded Sturge that "this call[']s recorded," which it was.  (*Id.*).

On April 25, 2017, Wolas filed an affidavit with the Circuit Court stating that he did not oppose Sturge's petition to transfer the entire contents of the Retirement Account to her.  (Ex. 27).

On May 15, 2017, the Circuit Court in Florida entered a QDRO ordering that Sturge should receive the entire contents of the Retirement Account.  (Ex. 28 at 1).  In the order, the court noted that "Counsel advised he had spoken with [Wolas], who was then in the Federal Detention Center in Miami, and the Former Husband was agreeable to waive the service of process and agree to the entry of the QDRO."  (*Id.*).  The court also noted in the order that Wolas had filed an affidavit in support of her petition to modify the 2001 divorce decree.  (*Id.*).

Wolas testified that he and Sturge "[never] discuss[ed] sharing the proceeds of the

retirement account" and that there was no "agreement to relinquish [his] rights in the retirement account to compensate [] Sturge for helping [him] out." (Wolas Dep. at 22). Sturge testified similarly that there was "[no] agreement . . . on how to divide the retirement account" and that she did not "think he was going to take any portion of the retirement account from [her] when he [sic] got it." (Sturge Dep. at 92, 93).

### 9.     Wolas's Plea of Guilty and the Forfeiture Order

On June 29, 2018, Wolas pleaded guilty to a ten-count superseding information pursuant to a plea agreement with the United States. (Dkt. Nos. 9, 67).[11] The superseding information charged him with seven counts of wire fraud and aiding and abetting, in violation of 18 U.S.C. §§ 1343 and 2; aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and (c)(5); misuse of a social security number, in violation of 42 U.S.C. § 408(a)(7)(B); and tax evasion, in violation of 26 U.S.C. § 7201. (Superseding Information ¶¶ 15-22).

The superseding information also included a forfeiture allegation pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). That allegation stated that upon his conviction for any of the seven counts of wire fraud, the United States intended to seek the forfeiture of any property derived from proceeds traceable to the wire fraud offenses ("offense property"). (*Id.* ¶ 23). The notice also provided that the United States would seek forfeiture of any other property of Wolas if any of the five conditions in 21 U.S.C. § 853(p)(1), as incorporated by 28 U.S.C. § 2461(c), were met ("substitute property"). (*Id.* ¶ 24). Pursuant to the plea agreement, Wolas agreed that such conditions were met, and to forfeit to the United States $1,787,813, including all of the

---

[11] On April 4, 2017, the United States had filed an initial criminal complaint against defendant. (Dkt No. 3).

funds in his Retirement Account.  (Superseding Information, Ex. 2 ¶ 9).[12]

Wolas represents that the Retirement Account is his only financial asset,[13] and the United States has been unable to locate any other financial assets or source of income that could be Wolas's.  (Wolas Dep. at 59, 60; Bell Aff., ¶ 38).  On September 18, 2019, the Retirement Account had a balance of $788,292.37.  (Weisiger Dep. at 26).

## B.   Procedural Background

On June 2, 2017, as part of a separate civil action, the United States moved *ex parte* for a temporary restraining order to prevent the transfer or dissipation of assets in the Retirement Account.  *United States v. Wolas*, 17-cv-11032-RWZ (Dkt. No. 6).  On June 5, 2017, Senior Judge Zobel granted the restraining order.  *United States v. Wolas*, 17-cv-11032-RWZ (Dkt. No. 12).  That order remains in effect.  (*Id.*).

On November 5, 2018, the Court entered a preliminary order of forfeiture of all of Wolas's interest in the Retirement Account.  (Dkt. No. 78 ¶ 3).

On January 28, 2019, Sturge filed the present petition pursuant to 21 U.S.C. § 853(n)(2), 28 U.S.C. § 2461(c), and Fed. R. Crim. P. 32.2 asserting an interest in the Retirement Account.  (Dkt. No. 90).  On May 6, 2019, the government applied for a writ of garnishment pursuant to 28 U.S.C. § 3205(c)(1).  (Dkt. No. 106).  On December 14, 2019, Sturge objected to the issuance of a writ of garnishment.  (Pet. Supp. Mem. at 3).

Both parties have now moved for summary judgment.  For the reasons stated below, the

---

[12] After Wolas's guilty plea, the United States identified two additional victims, one with losses of $152,000, and the other with a $10,000 loss, respectively, bringing the amount of proceeds to $1,949,813.  (Dkt. 88 at 2).  An amended money judgment was entered against Wolas for $1,949,813, but the forfeiture order was not amended.

[13] In a hand-written notation to the financial disclosure statement Wolas provided to the United States he added "which I no longer have any interest in."  (Wolas Dep. at 35:18-44:10).

government's motion for summary judgment will be granted, and petitioner's motion for summary judgment will be denied. The government's application for a writ of garnishment will be granted.

## II.  Legal Standard

Rule 32.2(c) governs ancillary proceedings. Fed. R. Crim. P. 32.2(c). It provides that "[w]hen discovery ends, a party may move for summary judgment under Federal Rule of Civil Procedure 56." *Id.* The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation mark omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must "view the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials

of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## III. Analysis

### A. Ancillary Proceedings Pursuant to 21 U.S.C. § 853(n)(2)

A third party claiming a legal interest in property that has been ordered forfeited to the United States may petition the court for a determination of the validity of the alleged interest in the property. 21 U.S.C. § 853(n)(2). The petitioner "must first establish [] standing to challenge the forfeiture order by demonstrating a 'legal interest' in the forfeited property . . . ." *United States v. Watts,* 786 F.3d 152, 160 (2d Cir. 2015). After standing is established, to prevent forfeiture, he or she must prove by a preponderance of the evidence that the "legal right, title, or interest in the property" was "vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property . . . ." 21 U.S.C. § 853(n)(6)(A).[14] In determining the validity of the petitioner's interest in the property, courts apply the law of the jurisdiction that created the interest. *See United States v. White*, 675 F.3d 1073, 1078 (8th Cir. 2012).

Pursuant to § 853(c), the government's interest in offense property vests at the moment of the offense. 21 U.S.C. § 853(c). If for any of five reasons enumerated in § 853(p)(1) the United States cannot secure offense property, it may seek forfeiture of substitute property. 21 U.S.C. § 853(p)(2). The statute does not specify when the government's interest in substitute property vests, and courts have reached different conclusions on the issue. *See* 21 U.S.C. § 853(c). The First Circuit has not yet addressed the question. For present purposes, it is enough to note that courts in other jurisdictions appear to agree that the interest does not vest any earlier than the

---

[14] A *bona fide* purchaser may also qualify for relief from forfeiture. 21 U.S.C. § 853(n)(6)(b). Sturge does not claim to be a *bona fide* purchaser. (Pet. Mot. Summ. J. at 10).

defendant's indictment noticing forfeiture, and may vest later.  *See, e.g.*, *United States v. Chamberlain*, 868 F.3d 290, 294-95 (4th Cir. 2017) (canvassing cases); *United States v. Jarvis*, 499 F.3d 1196, 1205 (10th Cir. 2007) (noting that at the time of indictment, "[t]he government's interest in [substitute assets] . . . is only a potential and speculative future interest . . . [and] cannot mature into an actual interest until after *conviction*") (emphasis added); *United States v. Egan*, 654 F. App'x 520, 521 & n.1 (2d Cir. 2016) (assuming without deciding that the government's interest vests, "at the very latest, upon entry of [a preliminary] order of forfeiture concerning that property"); *United States v. Peterson*, 820 F. Supp. 2d 576, 585 (S.D.N.Y. 2011) (finding that the government's interest vests upon return of grand jury indictment noticing forfeiture).

As the Second Circuit has explained, the issue of the timing of the vesting of the government's interest in the property can become important to third-party petitions pursuant to § 853(n)(2).  *United States v. Daugerdas*, 892 F.3d 545, 549 (2d Cir. 2018).  That is because there could be a gap between "the offense conduct and the vesting of the government's interest in the property" if the government's interest in substitute property does not vest at the moment of the offense.  *Id.*  During that interval, "a third party's interest could potentially attach . . . ."  *Id.*[15]

Sturge contends that such a scenario occurred here.  She contends that her interest in the Retirement Account vested no later than November 13, 2001, when the Florida court issued the divorce decree, or at the very latest by May 15, 2017, when the Florida court issued the QDRO

---

[15] By its own terms, § 853(n)(6)(A) appears to leave petitioners contending that their interests in substitute property attached after the offense without a remedy.  *See* 21 U.S.C. § 853(n)(6)(A) (a petitioner must prove that she has an interest in the property that was vested in petitioner rather than defendant or superior to defendant's interest "*at the time of the commission of the acts which gave rise to the forfeiture of the property*.") (emphasis added).  However, courts have concluded that third party petitioners have a due process right to be heard on the issue of whether "[his or her] interest in the property is superior to the government's."  *Daugerdas*, 892 F.3d at n.13.  To prevail, the petitioner must prove that his or her interest in the property vested before the government's interest vested.  *See id.*; *United States v. Espada*, 128 F. Supp. 3d 555, 562 (E.D.N.Y. 2015).

granting her full ownership of the Retirement Account.  (Pet. Opp. at 4, 7).[16]

The United States does not dispute that its interest in the Retirement Account vested after the date of the QDRO.  Instead, it contends that the QDRO was a fraudulent transfer under Florida law, and therefore Sturge "does not have an ownership interest in the Retirement Account as a result of the [QDRO]."  (Gov. Mem. in Supp. at 13).

### B.    Whether the Asset Belongs to Sturge Pursuant to Florida Divorce Law

Sturge first contends that under Florida law, when spouses divorce, any marital assets the divorce decree has not resolved become the spouses' joint property.  On that basis, she contends that even if the QDRO were a fraudulent transfer, she has an interest in the Retirement Account that vested in her at the time of the divorce decree in 2001 and prevents forfeiture.  (Pet. Supp. Mem. at 1).[17]

In Florida, marital assets are distributed equitably upon divorce.  Fla. Stat. Ann. § 61.075.  Such assets include "[a]ll vested and nonvested benefits, rights, and funds accrued during the marriage in *retirement*, pension, profit-sharing, annuity, deferred compensation, and insurance plans and programs."  Fla. Stat. Ann. 61.075(6)(a) (emphasis added).  A spouse who does not have legal title to a marital asset acquires an interest in that asset only if a court issues a judgment during the divorce proceeding establishing that interest.  *United States v. Kermali*, 60 F. Supp. 3d 1280, 1283 (M.D. Fla. 2014) ("In Florida, however, there is no legal interest in marital assets until a judgment vesting such interest has been entered in a divorce proceeding.");

---

[16] Two events in defendant's criminal case preceded the QDRO:  the filing of a criminal complaint on April 4, 2017, and his arrest three days later, on April 7.

[17] Section 853(p) restricts forfeiture of substitute property to property that belongs to the defendant.  *See* 21 U.S.C. § 853(p); *United States v. Lester*, 85 F.3d 1409, 1413 (9th Cir. 1996) ("Under the plain language of section 853(p) and section 853(n)(6)(A), [defendant] owns an undivided one-half interest in . . . [the] property which is subject to forfeiture, and [his wife] owns a vested undivided one-half interest . . . which is not subject to forfeiture.").

Fla. Stat. § 61.075(8) ("[T]itle to disputed [marital] assets shall vest only by the judgment of a court.").

After the final judgment of dissolution of a marriage is entered, the ownership interest of "property rights [that] were not introduced in the litigation, but *could or should have been*, . . . *is settled once and for all . . . .*"  *Steinfeld v. Steinfeld*, 553 So. 2d 774, 776 (Fla. Dist. Ct. App. 1989) (emphasis added).  *See Smith v. Cahill*, 141 So. 3d 1047, 1053 (Ala. Civ. App. 2013) (applying similar Alabama law: "when a specific asset of the parties to a divorce action is not disposed of by the decree, the parties are left in the same position relative to that asset as they were in prior to the decree") (quoting *Johnson v. Johnson*, 585 So. 2d 89, 90 (Ala. Civ. App. 1991); *see also* Brett R. Turner, Equitable Distribution of Property § 9:28 ("Where the court fails to divide a marital asset, there is no basis for dividing the asset at a later time," and "[t]he spouse who has legal title to that asset is entitled to retain full ownership."); *Love v. Love*, 770 So. 2d 256, 256 (Fla. Dist. Ct. App. 2000) (reversing a trial court order distributing military retirement benefits to a former wife seventeen years after the divorce); *Preston v. Burmeister*, 52 S.W.3d 386, 390 (Tex. Ct. App. 2001) (rejecting an argument that retirement benefits not disposed of in a Florida divorce decree "became property held as a tenancy in common upon divorce.").[18]

Nevertheless, Sturge contends that *Steinfeld* supports her position.  There, a court considered two checks that had been issued jointly to a divorced couple after the court had already entered the dissolution judgment, where the right to the proceeds of at least one of the checks may have arisen during the course of the marriage.  *Steinfeld*, 553 So. 2d at 775-76.  The

---

[18] Sturge distinguishes *Love* on the basis that the court did not discuss "the property status of those benefits or whether underlying *assets* (if any) even qualified as marital property."  (Pet. Opp. at 6).  However, the court in *Love* noted that the wife was seeking to modify the judgment "for the purpose of addressing for the first time *equitable distribution* of the former husband's military retirement benefits," which implies that the assets were marital.  *Love*, 770 So. 2d at 256.

court determined that the trial court lacked jurisdiction to force a division of the property,

because subsequent litigation as to any property rights that could have or should have been

introduced in the divorce proceeding was barred.  *Id.* at 776.  However, in reaching its

conclusion, the court made the following statement, on which Sturge relies:  "[w]hen the parties'

marriage was dissolved, any marital assets not otherwise resolved by the property settlement

agreement or the final judgment became joint property of the parties."  *Id.*; Pet. Opp. at 5.

That statement may not be as broad as Sturge contends, however.  As the court noted,

although the court lacked jurisdiction to distribute the checks, the divorced couple could file a

separate action to seek an appropriate division of their joint checks.  *Id.*  In such an action, the

divorced couple would no longer rely on the law of equitable ownership, but on the law of joint

ownership.  *See, e.g.*, *Davis v. Dieujuste*, 496 So. 2d 806, 809 (Fla. 1986) (noting that parties

may seek statutory partition); *Cleary v. Hough*, 567 So. 2d 1039, 1040 (Fla. Dist. Ct. App. 1990)

("Since the final judgment in that action was silent as to [stock held as joint tenants], the parties,

by operation of law, became owners as tenants in common on the date of the final judgment.").

Thus, it is likely that the court in *Steinfeld* made the statement Sturge relies upon because the

checks in question were issued to the parties *jointly*, not because all marital assets not addressed

in a divorce proceeding become joint property upon divorce.

The general rule that a divorce decree finally determines all property rights that could

have been raised in the original proceeding is subject to a limited number of exceptions that may

permit a court to amend the judgment after it has entered.  Fla. Fam. L. R. P. R. 12.540(b).

Among other things, a party may move the court for relief from the judgment pursuant to Rule

12.540(b)(1) due to "mistake, inadvertence, surprise, or excusable neglect," as long as he or she

does so within one year of the judgment.  Indeed, here, the petition to obtain the QDRO states

that the 2001 divorce decree "*mistakenly* state[d] that there was no marital property subject to equitable distribution." (Ex. 22) (emphasis added).[19]

Here, Sturge did not have an interest in the Retirement Account that vested in her upon her divorce. First, she knew or reasonably should have known about the Retirement Account at the time of the divorce proceeding. There is substantial evidence in the record that Sturge contacted the Retirement Plan in both 1997 and 2000 to inquire about transferring the Retirement Account to her. Even assuming that there is a good-faith dispute as to whether those contacts took place, it is clear that she reasonably should have known that such an asset existed. She knew that her husband was a partner at a major law firm for many years before becoming a fugitive. It would be unusual, to say the least, if the firm had no tax-advantaged retirement plan, or if Wolas had declined to participate in such a plan, or otherwise had made no provision for his retirement. Sturge was represented by counsel in the divorce proceeding. And the form of the petition for the divorce specifically asked whether she or her husband had a "Pension Fund IRA," "Retirement Fund," or any "Other Assets."

In short, the existence of the Retirement Account could or should have been raised in the Florida divorce proceeding. It was not, and the issue of whether Sturge was entitled to any portion of it as a marital asset was "settled once and for all"—at least until the QDRO was

---

[19] In addition, a court can equitably distribute property rights that could have been, but were not, addressed by the court's divorce decree if the court specifically reserves jurisdiction to do so. *Mason v. Mason*, 371 So. 2d 226, 227 (Fla. Dist. Ct. App. 1979). A general reservation of jurisdiction is not enough; rather, the court "must reserve jurisdiction for a specific purpose regarding identified property." *See Encarnacion v. Encarnacion*, 877 So. 2d 960, 963 (Fla. Dist. Ct. App. 2004); *Mason*, 371 So. 2d at 227. The following reservations of jurisdiction have been found to be "general": "this court does hereby retain jurisdiction of this cause and the parties hereto," *Mason*, 371 So. 2d at 227, "[t]his Court retains jurisdiction over the matter of attorney's fees, the parties and the subject matter to enter such other and further orders as the Court deems necessary and just in the premises," *Harman v. Harman*, 523 So. 2d 187, 187-88 (Fla. Dist. Ct. App. 1988), and "the Court retains jurisdiction of this cause and the parties hereto to enter such other and further orders as may be appropriate." *Brandt v. Brandt*, 525 So. 2d 1017, 1018 (Fla. Dist. Ct. App. 1988). Here, the court's reservation of jurisdiction was clearly general: "the Court reserves jurisdiction of the parties and the subject matter hereof to make such further orders as may be necessary."

issued—"when the judgment of dissolution [became] final."  *Steinfeld*, 553 So. 2d at 776.  In

other words, if Sturge had an equitable interest in the Retirement Account as a marital asset, it

was extinguished by the divorce judgment.  As to that asset, the judgment left Sturge and Wolas

in the same position as they had been in prior to the decree; Wolas had full ownership of the

Retirement Account, and Sturge had none.  And Sturge did not seek to amend the judgment on

the basis of mistake or excusable neglect within the one-year period following the judgment's

issuance, as Florida law would have permitted her to do.  The question then becomes whether the

transfer of the Retirement Account from Wolas to Sturge pursuant to the QDRO is valid.

### C.    Whether the Transfer Was Fraudulent under Florida Law

The government contends that the transfer of the Retirement Account pursuant to the

QDRO was a fraudulent transfer under Florida law, and therefore voidable, because it was

undertaken for the purpose of defrauding Wolas's creditors, and because Wolas did not receive

equivalent value for the transfer and it prevented him from paying his debts as they came due.[20]

### 1.    Overview

Under the Florida Uniform Fraudulent Transfer Act ("FUFTA"), adopted in 1987, a

creditor may avoid a transfer of property under certain circumstances.  *See* Fla. Stat. Ann. §

726.105.  In highly simplified terms, a transfer may be avoided if it was intended to defraud a

creditor ("actual fraud") or had the effect of preventing the creditor from being paid

("constructive fraud").  The relevant portion of the statute provides as follows:

> 1.  A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor, whether the creditor's claim arose before or after the transfer was made or the

---

[20] The parties agree that the issue of fraudulent transfer should be analyzed under Florida law.  (*See* Pet.
Mot. Summ. J. at 9; Gov. Opp. at 1).

obligation was incurred, if the debtor made the transfer or incurred the obligation:

>    (a)  With actual intent to hinder, delay, or defraud any creditor of the debtor; or

>    (b)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>    . . .

>    2.  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

*Id.*

There is no dispute that a "transfer" of property occurred within the meaning of the statute.  Under the FUFTA, a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Fla. Stat. Ann. § 726.102(14).  A transfer of property "pursuant to a collusive divorce decree or property settlement intended to hinder, delay or defraud creditors (or pursuant to a divorce decree or property settlement for inadequate consideration, leaving the debtor insolvent) constitutes a 'transfer . . . .'"  *See Canty v. Otto*, 41 A.3d 280, 290 (Conn. 2012) (quoting *Webster v. Hope*, 231 B.R. 403, 415 (Bankr. D.D.C. 1999)).

Nor is there a dispute that Wolas had creditors at all relevant times.  As of 1997, when he became a fugitive, he owed the victims of his pyramid scheme at least $100 million.  And as of September 2016, he owed the victims of his real estate fraud approximately $1.9 million.  Those claims accrued no later than the moment Wolas fraudulently induced his victims to part with their investments.

The parties dispute, however, whether the government qualifies as a "creditor" entitled to the protection of the statute, and whether the government has established that either actual or

constructive fraud occurred in connection with the transfer.

### 2.   "Creditors" Under the FUFTA

Under the FUFTA, a transfer may be found fraudulent "as to a creditor" under certain circumstances (either because of actual fraud or constructive fraud).  Fla. Stat. Ann. § 726.105.  A "creditor" is defined as "a person who has a claim."  *Id*. § 726.102(5).  A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id*. § 726.102(4).

Sturge contends that for a creditor to avoid a transfer as fraudulent, that creditor must have at least one claim against that debtor at the time the transfers were made.  (Pet. Opp. at 2.)  According to her, the government did not become a creditor until June 29, 2018, when Wolas pleaded guilty, and the QDRO transferring the property was issued more than a year earlier, on May 15, 2017.  Therefore, according to her, the QDRO could not have been a fraudulent transfer because "the rights of the government (and Wolas'[s] victims) to obtain restitution vested no earlier than the date of Wolas'[s] conviction."  (Pet. Opp. at 2).[21]

Sturge's position has some support in the case law.  *See Citation Mortgage, Ltd. v. Ormond Beach Associates Ltd.*, 184 F.3d 143, 156 (2d Cir. 1999) (applying Florida law) (stating that in order to avoid a transfer as fraudulent, "a creditor must have at least one claim in existence when the transfers were made") (quoting *Harper v. United States*, 769 F. Supp. 362, 366-67 (M.D. Fla. 1991)); *see also Wiand v. Lee*, 753 F.3d 1194, 1203 (11th Cir. 2014) (stating that creditors seeking to avoid transfers under § 726.105(1)(a) must demonstrate that "(1) there

---

[21] As discussed, under federal law, the United States' (and the victims') interest in the offense property vested at the moment of the offense, while its interest in the substitute property vested, at the earliest, upon the notice of forfeiture in the indictment.

*was a creditor to be defrauded*; (2) a debtor intending fraud; and (3) a conveyance of property

which could have been applicable to the payment of the debt due") (emphasis added and

omitted) (quoting *Nationsbank, N.A., v. Coastal Utils., Inc.*, 814 So. 2d 1227, 1229 (Fla. App.

2002)).

That position, however, runs contrary to the language of the statute itself, which states

that a transfer may be fraudulent as to a creditor "whether the creditor's claim arose *before or*

*after the transfer was made* or the obligation was incurred." Fla. Stat. Ann. § 726.105 (emphasis

added).[22] That language clearly indicates that a creditor (here, the government) can avoid a

transfer even if the creditor's claim did not exist at the time of the transfer, but only arose

afterward. And at least one district court in Florida has squarely rejected Sturge's position.

*Berman v. Smith*, 510 B.R. 387, 394 (Bankr. S.D. Fla. 2014) (the "IRS [was] not barred from

asserting a fraudulent transfer claim under § 726.105 merely because it became a creditor after

the transfer at issue.").[23]

Furthermore, the cases on which Sturge relies, *Harper* and *Citation Mortgage*, do not

actually address the question presented here. In *Harper*, the IRS had made a jeopardy

assessment against the transferee for the transferor's federal income-tax liabilities for several tax

years preceding the date of the transfer. *Harper*, 769 F. Supp. at 364. The court concluded that

"the United States was a creditor with standing to institute a fraudulent conveyance action since

---

[22] In addition, although it was considering Kentucky's fraudulent conveyance laws, the Sixth Circuit affirmed a trial court decision that the United States could avoid a defendant's transfer of substitute property to a third-party petitioner pursuant to fraudulent conveyance laws notwithstanding the fact that the transfer had taken place long before the indictment noticing forfeiture of potential substitute property. *United States v. Coffman*, 612 F. App'x 278, 287-88, 291 (6th Cir. 2015).

[23] While *Berman* did not specify under which section of § 726.105 the IRS was proceeding, it noted that another party who had alleged a claim under both § 726.105 (1)(a) and (b) would likewise not have been barred by such an argument. *See id.*, n.3.

the assessments made against Reed relate back to the tax years from which the liability arose." *Id.* at 366-67.  In *Citation Mortgage*, the Second Circuit affirmed a trial court decision that the appellant could not maintain a fraudulent transfer action because the appellant had never had any claims against the transferor either before or after the transfer.  *Citation Mortgage Ltd.*, 184 F.3d at 155-157.   And in *Wiand*, the Eleventh Circuit affirmed a trial court decision that the funds transferred were the property of separate corporations, not that of the individual who owed the debts.  *Wiand*, 753 F.3d at 1203, 1205.  *Harper* thus involved a transfer made after the government had become a creditor; *Citation Mortgage* involved a party that never had any claim against the debtor at all; and *Wiand* involved a dispute over the property transferred, not the standing of the creditor.

It is also noteworthy that while the first portion of the statute uses the term "a creditor," the actual fraud provision uses the term "any creditor," and the constructive fraud provision does not use the term "creditor" at all.  Fla. Stat. Ann. §§ 726.105(1), (1)(a), 1(b).  Thus, in all cases, a creditor may seek to avoid a transfer whether that creditor's claim arose before or after the transfer.  If the creditor seeks to prove *actual* fraud, it must show that the transferor intended to hinder, delay, or defraud "any" creditor (which could be the creditor seeking to avoid the transfer, or some other creditor).  *See Veigle v. United States*, 873 F. Supp. 623, 626 (M.D. Fla. 1994) ("Under Florida's fraudulent conveyance statute, a transfer is fraudulent as to *present creditors* if the debtor made the transfer with actual intent to hinder, delay, or defraud *any creditor* of the debtor.") (internal quotation marks omitted) (emphasis added).[24]  If the creditor

---

[24] *But see* National Conference of Commissioners on Uniform State Laws, Uniform Voidable Transfer Act (as amended in 2014) at 21-22 ("Similarly, there is no requirement [under the actual intent provision] that the intent referred to be directed at a creditor *existing* or identified *at the time of transfer* or incurrence.") (emphasis added).

seeks to show *constructive* fraud, it need not prove that there was any then-existing creditor.[25]

In short, the government qualifies as a "creditor" of Wolas within the meaning of Fla. Stat. Ann. § 726.105, even assuming that its claim did not arise until Wolas pleaded guilty on June 29, 2018.[26]  It therefore may seek to avoid the transfer of the Retirement Account, whether on grounds of actual fraud or constructive fraud.

### 3.   Actual Fraud

As noted, the FUFTA requires creditors seeking to avoid a transfer on the basis of actual fraud under § 726.105(1)(a) to demonstrate that "the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."  Fla. Stat. Ann. § 726.105(1)(a).

It is undisputed that a transfer of property occurred.  It is also undisputed that Wolas had creditors as of the date of the transfer; he owed the victims of his crimes many millions of dollars.  And it is undisputed that the property transferred could have been used to satisfy, in part, the claims of those victims.[27]

The question, then, is whether Wolas acted with the requisite intent.   Again, the intent to

---

[25] *Cf. WRT Energy Corp. v. WRT Bankruptcy Master File*, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001) ("This part of [the equivalent section of bankruptcy statute] protects future creditors from a debtor who transfers assets with the intent to hide them or impair the debtor's ability to pay debts as they arise or with the belief that inability to pay debts would likely result."); *Rollaguard Security, LLC v. JP Morgan Chase Bank*, 591 B.R. 895, 907 (Bankr. S.D. Fla. 2018) (noting that fraudulent transfer claims under Florida law are analogous in form and substance to their bankruptcy counterparts).

[26] To the extent that the government is standing in the shoes of Wolas's victims, its claims arguably accrued at the time of his crimes, or related back to that time once he pleaded guilty to those crimes.  The Court does not reach those issues here.  And even if § 1(a) does in fact require at least one creditor to exist at the time of the transfer, Wolas had creditors long before he and Sturge formed the plan to obtain the QDRO in 2016, and before the court finalized the QDRO in 2017.  Wolas was indicted on 119 counts of fraud and grand larceny stemming from his participation in a pyramid scheme that defrauded investors of an estimated $100 million or more.  Between 2014 and 2016, he again defrauded investors of approximately $1.9 million.  Every one of his victims was a creditor of Wolas as of the time of the QDRO.

[27] The requirement that the creditor must show that the conveyance of property is one which could have been applicable to the payment of the debt applies to both § 726.105(1)(a) and (1)(b), and seems to be a product of § 726.102(2), which excludes from the definition of "asset" property that is generally exempt under non-bankruptcy law.  *See* Fla. Stat. Ann. § 726.102(2); *2-Bal Bay Properties, LLC v. Asset Management Holdings*, 291 So. 3d 617, 620 (Fla. Dist. Ct. App. 2020) ("[F]or a transaction to be considered a fraudulent transfer under the UFTA, the

defraud creditors need not have been directed at the creditor seeking to avoid the transfer.  *See Veigle*, 873 F. Supp. at 626 (M.D. Fla. 1994) ("Under Florida's fraudulent conveyance statute, a transfer is fraudulent as to *present creditors* if the debtor made the transfer with actual intent to hinder, delay, or defraud *any creditor* of the debtor.") (internal quotation marks omitted) (emphasis added).

The statute sets out eleven non-exclusive factors that may be considered in determining actual intent.  Fla. Stat. Ann. § 726.105(2).  Among those factors are (1) whether the transfer or obligation was disclosed or concealed; (2) whether before the transfer was made, the debtor has been sued or threatened with suit; (3) whether the debtor absconded; (4) whether the transfer was of substantially all the debtor's assets; (5) whether the debtor was insolvent or became insolvent shortly after the transfer was made; and (6) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.  § 726.105(2)(a)-(k).  Although proof of one factor alone may not be enough to establish an intentionally fraudulent transfer under § 726.105(1)(a), at least one court has concluded that three factors were enough.  *United States v. Romano*, 757 F. Supp. 1331, 1335-36, 1338 (M.D. Fla. 1989).

Here, the transfer by Wolas to Sturge satisfies the six factors listed above—that is, the transfer satisfies more than half of the eleven non-exclusive factors that may be considered in determining actual intent pursuant to § 726.105(2).

As to the first, second, and third factors:  Wolas came up with the idea to obtain the

---

property being transferred must qualify as an asset [under statutory definitions].").  Retirement assets are "exempt property" under Florida law if the retirement plan is "in substantial compliance" with the relevant provisions of the Internal Revenue Code.  *See* Fla. Stat. Ann. § 222.21.  However, under 21 U.S.C. § 853(p), retirement assets are not exempt property.  *See* § 853(p); *United States v. Bollin*, 264 F.3d 391, 399 (4th Cir. 2001) (overruled on other grounds) ("Federal forfeiture law supersedes the garnishment protections that Georgia state law provides for funds in an *individual retirement account*.") (emphasis added).

QDRO while still a fugitive, after "abscond[ing]" from authorities for a second time in September 2016.  Fla. Stat. Ann. § 726.105(f).  At that time, he "ha[d] been sued or threatened with suit," because he had been a fugitive for nearly twenty years, had already been indicted for 119 counts of fraud and grand larceny in connection with his first criminal scheme, and had defrauded investors of $100 million or more between his two criminal schemes.  § 726.105(d).

Wolas also "concealed" his involvement in the transfer from the administrators of the Retirement Plan, and initially, from the Circuit Court in Palm Beach County.  § 726.105(c).  He drafted documents to be filed in court by Sturge to obtain the QDRO, and sent e-mails posing as Sturge to Weisiger and to counsel for the Retirement Plan to obtain information about the Retirement Account and seek their input on the QDRO.  And in the initial petition filed with the Circuit Court of Palm Beach County on February 8, 2017, which Wolas drafted, Sturge swore that Wolas's "whereabouts are unknown," and that she had had no contact with him since 1995.  Those statements were false, and in fact Wolas was with Sturge when she swore to their truth.

In addition to concealing his involvement in the transfer from administrators of the Retirement Plan and the Circuit Court, Wolas also concealed the transfer itself from federal authorities.  § 726.105(c).  In April 2017, after Sturge filed the petition, but before the court had acted on it, Wolas was arrested and charged with one count of wire fraud and aggravated identity theft in connection with his second criminal scheme.  On April 7, 2017, at his initial appearance in federal court, Wolas testified that he had no funds or assets, of any kind, anywhere in the world, despite that he still had full ownership of the Retirement Account at the time, and was planning to transfer it to Sturge.  He continued to work with Sturge on obtaining the QDRO from jail.  When he and Sturge spoke over the telephone, he referred to the QDRO as the "project,"

and reminded her that the calls at the jail were recorded.

As to the fourth and fifth factors, "the transfer was of substantially all [Wolas's] assets," and he "was insolvent or became insolvent shortly after the transfer was made." § 726.105(e), (i). Wolas has represented that the Retirement Account is his only financial asset, and the government has not been able to locate any other financial assets or sources of income that could be Wolas's. Finally, as to the sixth factor, he and Sturge both claim that there was no agreement or plan to share any portion of the Retirement Account, and there is certainly no evidence in the record to suggest that Wolas received value "reasonably equivalent to . . . the asset transferred," which had a balance of more than $600,000 as of April 2017, one month before the transfer was completed. § 726.105(h).

In sum, the undisputed evidence shows that the transfer meets six of the factors to be considered in determining actual intent, which courts have found to be more than sufficient. Wolas made the transfer "with actual intent to hinder, delay, or defraud" his creditors, making the transfer actually fraudulent within the meaning of Fla. Stat. Ann. § 726.105(1)(a).

### 4. Constructive Fraud

The government also contends that the transfer was constructively fraudulent. Again, even without a finding of actual intent, a transfer by a debtor may be fraudulent as to a creditor if, among other things, (1) the debtor made the transfer without receiving reasonably equivalent value, and (2) the debtor believed or reasonably should have believed that he or she would incur debts beyond his or her ability to pay as they became due. Fla. Stat. Ann. § 726.105(b)(2).

The statute does not define "reasonably equivalent value," but in reviewing the transfer, courts consider the "good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." *Kapila*

*v. WLN Family Ltd.*, 341 B.R. 53, 56-57 (Bankr. S.D. Fla. 2006).[28]  As to the second element, the test solely concerns the debtor's ability to pay its debts as they become due, and not whether the debtor is technically solvent or insolvent.  *United States v. South Capital Construction, Inc.*, 758 F. App'x 676, 680 (11th Cir. 2018).

Here, the transfer meets both elements of constructive fraud.  As noted, Wolas made the transfer without receiving reasonably equivalent value.  There was an obvious disparity between the fair value of the Retirement Account, which was approximately $600,000 at the time of the transfer, and what Wolas received, which was nothing.  The transfer was not at arm's length, but was between former spouses.   And it was not made in good faith.  Wolas came up with the idea for the QDRO while a fugitive from justice based on two different schemes in which he defrauded multiple investors of millions of dollars.  Sturge and Wolas knowingly submitted a false affidavit to the Florida court to accomplish the transfer.  And Wolas told authorities that he had no assets of any kind, anywhere in the world, despite the fact that he still had full ownership of the Retirement Account when he made that representation and was in the process of transferring it to Sturge.

Furthermore, at the time of the transfer, Wolas likely did not believe, nor would it have been reasonable for him to believe, that he would be able to pay off his debts as they became due.  Before the court had acted on the QDRO, Wolas had been arrested for a criminal scheme that defrauded approximately 20 investors of approximately $1.9 million.  He was also a fugitive from justice after being indicted on 119 counts of fraud arising out of a criminal scheme that defrauded investors out of $100 million or more.  Obviously Wolas could not have reasonably

---

[28] It is not clear whether those factors should also apply to consideration of the identical factor in § 726.105(2).

believed, at the time the transfer was made, that he would be able to pay those debts, which became "due" the moment he persuaded his victims to part with their funds.

Thus, both factors of constructive fraud are met: Wolas (1) made the transfer without receiving reasonably equivalent value, and (2) believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

### 5.     Whether an Equitable Remedy is Appropriate

Sturge further contends that even if the Court concludes that the transfer were fraudulent, it has the equitable power to divide the Retirement Account and should do so in order to permit her to retain a portion of the funds. (Pet. Opp. at 2, 3 ("[E]ven on the government's view of the facts and law, this court has discretion to fashion a just and equitable remedy.")). The government contends that fraudulent transfers are void *ab initio*, and Sturge therefore lacks standing because she "does not have a legal interest in the fraudulently transferred Retirement Account." (Gov. Opp. at 1). In addition, it contends that she "is not entitled to have this court conduct a do-over of the equitable distribution of property in connection with her 2001 divorce." (*Id.* at 8).

A fraudulent transfer of property is not void *ab initio*. Rather, it is "voidable at the instance of a creditor." *Smith v. Effective Teleservices, Inc.*, 133 So. 3d 1048, 1051 (Fla. Dist. Ct. App. 2014). Section 726.108 of the FUFTA provides for the following remedies:

(1) In an action for relief against a transfer . . . a creditor. . . may obtain:

    (a) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claims;

    (b) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with applicable law; or

    (c) Subject to applicable principles of equity, and in accordance with applicable rules of

civil procedure

. . .

(3) Any other relief the circumstances may require.

Fla. Stat. Ann. § 726.108.

This last phrase is known as the "catch-all" phrase. *Freeman v. First Union Nat. Bank*, 865 So. 2d 1272, 1275 (Fla. 2004). Although it allows courts to award "other relief," it was intended to facilitate the use of the other remedies provided in the statute. *Id.* at 1276. Nonetheless, courts have noted that the catch-all phrase is "broad," and grants "the court equity powers to remedy the fraud." *Invo Florida, Inc. v. Somerset Venturer, Inc.*, 751 So. 2d 1263, 1267 (Fla. Dist. Ct. App. 2000) (agreeing with appellant's contention that an action under the FUFTA is broader than a breach of contract claim).

Even assuming that the Court has the power to divide the Retirement Account between Wolas and Sturge pursuant to principles of equity, it declines to do so. Sturge clearly engaged in inequitable conduct in connection with the Retirement Account. She admits that she attempted to obtain the asset between January 2014 and September 2016 by claiming that Wolas was dead, which she knew to be false.[29] While there is no evidence she had any role in the filing of the petition to have Wolas declared dead, she used that declaration in her communications with the Retirement Plan even though she knew it to be false.

In addition, Sturge admits that as part of her petition to the court to obtain the QDRO in 2017, she submitted a sworn affidavit that falsely stated that she did not know Wolas's whereabouts and had had no contact with him since 1995. Finally, in November 2016, she was

---

[29] If the Retirement Account had been listed as an asset in the divorce proceeding, there is a reasonable possibility that Sturge would have been awarded only a 50% interest. If, however, Wolas were dead, it is almost certain that Sturge would receive the entire amount.

interviewed by the FBI about Wolas, and lied to them, saying that she had had no contact with Wolas and did not know his whereabouts.[30]

Sturge further contends, in the alternative, that even if the Court concludes that the United States can maintain an action under the FUFTA, it should apply the principles set forth in *Crews v. Lankry*, 263 B.R. 638 (Bankr. M.D. Fla. 2001). (Pet. Mot. Summ. J. at 14). In *Crews*, the court found that "to establish that a separation agreement fraudulently transferred non-entireties properties acquired during a marriage," a creditor must prove that: (1) the property in question was in fact marital property and not separate property, (2) the distribution of marital property was unequal, and (3) a departure from equitable distribution was not justified by the factors recognized as relevant under Florida law. *Crews*, 263 B.R. at 644. The court concluded that fact issues under that test remained and precluded summary judgment. *Id.*

That principle is inapplicable here, however. By the time of the fraudulent transfer in 2017, the Retirement Account was no longer subject to the rules governing the division of marital assets. The divorce petition did not identify the Retirement Account, the divorce decree did not mention it, and Sturge did not seek to modify that decree during the one-year period after it issued. Thus, by 2017, the Retirement Account was simply an asset belonging to Scott Wolas, and Sturge had long since abandoned her ability to claim that it was a marital asset.

Under the circumstances, the Court will not equitably distribute any portion of the Retirement Account, even if it has power to do so. Instead, the appropriate remedy in this case is that the United States should be able to "avoid [] the transfer . . . ," which it has elected to do.

---

[30] Sturge's petition to obtain the QDRO also stated that she had not been aware of the existence of the Retirement Account at the time of the divorce in 2001. There is substantial evidence, however, that she contacted the law firm in 1997 and again in 2000 asking how she could obtain the funds in that account. Because Sturge disputes that evidence, the Court will not take it into account in considering the equities of the matter; but if that evidence were to be credited, it would represent yet another instance of inequitable conduct.

Fla. Stat. Ann. § 726.108(a).

### D.      Federal-State Relationship Considerations

One last set of issues merits consideration.  The transfer of the Retirement Account was not a simple transfer of property between parties, but was incorporated into a state-court judgment.  The question thus arises whether any doctrine or principle governing the relationship of federal and state courts requires a different outcome.  Sturge acknowledges that "state court divorce judgments are not immune from scrutiny as potentially fraudulent transfers."  (Pet. Supp. Mem. at 1).  She further acknowledges that "[t]he government is correct that legal doctrines such as 'full faith and credit,' [the] *Rooker-Feldman* [doctrine],[31] [and] domestic relations abstention[32] do not preclude a federal court from voiding a distribution of assets in divorce as fraudulent." (*Id*.).  She nonetheless contends that the Florida court had jurisdiction over the matter and the authority to issue the QDRO, and that "its judgment doing so is entitled to full faith and credit

---

[31] Under the *Rooker-Feldman* doctrine, "lower federal courts do not have jurisdiction to review a case litigated and decided in state court; only the United States Supreme Court has jurisdiction to correct state court judgments."  *Littler v. Massachusetts*, 2017 WL 3495173, at *4 (D. Mass. Aug. 14, 2017); *D.C. Ct. App. v. Feldman*, 460 U.S. 462, 467 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).  The doctrine does not apply to nonparties to the prior proceeding unless they are in privity with a party to the prior proceeding.  *3991 Transport Company v. Alexander*, 610 B.R. 881, 885 (Bankr. N.D. Ill. 2020) (finding that the doctrine applied to a fraudulent transfer claim brought by a debtor because that debtor, though not a party to the prior action, was in privity with a party); *Alliant Tax Credit 31, Inc. v. Murphy*, 924 F.3d 1134, 1147, n.14 (11th Cir. 2019).  Parties are in privity with one another "when [the party's] legal interests in the [state court] proceeding were congruent with [the privy's] legal interests."  *Raleigh v. Haskell*, 1998 WL 809520, at *4 (Bankr. N.D. Ill. Nov. 19, 1998).

Here, the United States was not a party to the proceeding to obtain the QDRO, and was not in privity with either party; the parties also agree that the United States could not have intervened in the proceeding.  (Gov. Supp. Mem. at 9-10; Pet. Supp. Mem. at 1-2).  In addition, it was not in privity with Sturge or Wolas; rather, its interests were opposed to theirs, because it was already prosecuting Wolas for his second fraudulent scheme at the time.  Thus, *Rooker-Feldman* does not prevent the court from voiding the QDRO.

[32] The domestic relations exception "prohibits federal courts from issuing or altering 'divorce, alimony, and child custody decrees.'"  *Mandel v. Town of Orleans*, 326 F.3d 267, 271 (1st Cir. 2003) (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992)).  The courts are divided as to whether the doctrine is limited to diversity claims, and the First Circuit has not decided the issue.  *Id.*  However, the domestic relations exception is inapplicable because the Court is not issuing or altering a divorce decree.  *Cf. United States v. Baker*, 852 F.3d 97, 99 (1st Cir. 2017) (affirming where the trial court had redivided assets that had been distributed in a divorce decree pursuant to fraudulent transfer laws).

and not subject to collateral challenge."  (*Id*. at 2).

The federal full-faith-and-credit statute, 28 U.S.C. § 1738, provides in substance that "a judgment rendered in a state court is entitled to the same preclusive effect in federal court as it would be given within the state in which it was rendered."  *In re Sonus Networks, Inc.*, *Shareholder Derivative Litig.*, 499 F.3d 47, 56 (1st Cir. 2007) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)); *see also* U.S. Const. Art. IV § 1.  Accordingly, the preclusive effect of the QDRO is determined according to Florida law.  *Id.*

A judgment under Florida law "may be [collaterally] attacked for . . . extrinsic fraud" at any time.  *Nichols v. Nichols*, 613 So. 2d 137, 139 (Fla. Dist. Ct. App. 1993); *Parker v. Parker*, 950 So. 2d 388, 391, 394 (Fla. 2007) ("Rule 1.540(b) specifically provides that '[t]his rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, decree, order, or proceeding or to set aside a judgment or decree for fraud upon the court.'").[33]  Although Florida courts do not appear to have considered the issue, courts in other jurisdictions have considered challenges pursuant to the Uniform Fraudulent Transfer Act to be based upon "extrinsic fraud."  *See, e.g.*, *Greeninger v. Cromwell*, 915 P.2d 479, 482 (Or. Ct. App. 1996) ("Plaintiff's claim that the [dissolution] judgment constitutes a fraudulent transfer under the UFTA contains allegations that, if proven, could constitute extrinsic fraud and permit a collateral attack on the [dissolution] judgment"); *Dowell v. Dennis*, 998 P.2d 206 (Okla. Civ. App. 1999) (party was permitted to collaterally attack divorce decree both because he was not a

---

[33] According to the Supreme Court of Florida, "extrinsic fraud is conduct which prevents a party from trying an issue before the court . . . [] whereas intrinsic fraud is the presentation of misleading information on an issue before the court that was tried or could have been tried."  *Parker*, 950 So. 2d at 391 (Fla. 2007).

party, and because he met fraud exception).

Again, the United States was not a party to the proceeding to obtain the QDRO, and could not have intervened to protect its interests, even if no acts of concealment had occurred. Therefore, under Florida law, it may make a collateral attack on the state-court judgment as a fraudulent transfer. And the full-faith-and-credit statute does not prevent a third party from challenging a transfer as fraudulent when the transfer was made pursuant to a collusive state-court divorce proceeding.

Thus, in *Alliant Tax Credit 31, Inc.*, the plaintiffs alleged that the defendant had colluded with his former wife to make a fraudulent transfer of his assets to her as part of a divorce settlement. *Alliant Tax Credit 31, Inc. v. Murphy*, 924 F.3d 1334, 1338 (11th Cir. 2019). The plaintiffs filed an action in federal court and challenged the transfer under the Georgia Uniform Fraudulent Transfer Act. *Id.* The court concluded, among other things, that the full-faith-and-credit statute did not prevent the plaintiffs from collaterally attacking the divorce settlement— which a state court had incorporated into a divorce decree—because plaintiffs were neither parties to the divorce proceeding nor in privity with a party to the divorce proceeding. *Id.* at 1139, 1147, n.14.

It is true that the United States is a separate sovereign, not a private plaintiff. But there is no obvious reason why it should be in a worse position than a private plaintiff to challenge a transfer as fraudulent. And, again, there is no other procedural vehicle—or at least the parties have not identified one—for it to protect its interests under the circumstances.

In *United States v. Kirtland*, 2012 WL 4463447 (D. Kan. Sept. 27, 2012), the court found that pursuant to the Fair Debt Collections Procedure Act the United States could avoid fraudulent transfers from a defendant to his wife of certain assets, notwithstanding that the settlement

agreement had been adopted by a state court. *Id.* at \*16 ("The mere fact the fraudulent transfers have been formalized by a state-court approved property settlement provides no immunity from federal law."). The court had also rejected petitioner's allegation that "the state court judgment . . . was entitled to full faith and credit" on an earlier motion to set aside a restraining order on the assets. *See United States v. Kirtland*, 2011 WL 3624997, at \*1, \*2 (D. Kan. Aug. 17, 2011).

Under the circumstances, the Court concludes that it has the authority to permit the United States to avoid the transfer, notwithstanding the requirements of the full-faith-and credit statute or its constitutional counterpart. And because the government has satisfied the requirements of the Florida Uniform Fraudulent Transfer Act to prove a fraudulent transfer, it will grant the request to avoid the transfer of the Retirement Account.

**IV.**     **Conclusion**

For the foregoing reasons,

1.      the Court finds that petitioner Cecily Sturge has standing to challenge the preliminary forfeiture order issued by the Court on November 5, 2018;

2.      the Court finds that petitioner Cecily Sturge has not proved, by a preponderance of the evidence, that any legal right, title, or interest in the Retirement Account was vested in her rather than Scott J. Wolas or was superior to any right, title, or interest of Scott J. Wolas at the time of the commission of the acts that gave rise to the forfeiture of the Retirement Account;

3.      the Court finds that the transfer of the Retirement Account from Scott J. Wolas to Cecily Sturge by means of a Qualified Domestic Relations Order issued by the Circuit Court for Palm Beach County, Florida, on May 15, 2017, was a fraudulent transfer within the meaning of the Florida Uniform Fraudulent Transfer Act, Fla. Stat. Ann. §§ 726.105(1)(a), (b);

4.      the Court grants the request of the United States to avoid the transfer of the Retirement Account to Cecily Sturge, and to return the Retirement Account to Scott J. Wolas;

5.      the motion of petitioner Cecily Sturge for summary judgment is DENIED;

6.      the motion of the United States for summary judgment is GRANTED;

7.      the petition of Cecily Sturge pursuant to 21 U.S.C. § 853(n)(2), 28 U.S.C. § 2461(c), and Fed. R. Crim. P. 32.2 is DENIED;

8.      the Court will enter a final order of forfeiture pursuant to 18 U.S.C § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Fed. R. Crim. P. 32.2(c); and

9.      the application of the United States for a writ of garnishment pursuant to 28 U.S.C. § 3205(c)(1) is GRANTED.

**So Ordered.**


                                        /s/  F. Dennis Saylor IV
                                        F. Dennis Saylor IV
                                        Chief Judge, United States District Court

Dated:  February 16, 2021

39